# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 26, 2007         Decided July 8, 2008

No. 06-1407

PUERTO RICO PORTS AUTHORITY,
PETITIONER

v.

FEDERAL MARITIME COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

ODYSSEA STEVEDORING OF PUERTO RICO, INC. AND
INTERNATIONAL SHIPPING AGENCY, INC.,
INTERVENORS

---

On Petition for Review of an Order of the
Federal Maritime Commission

---

*Gene C. Schaerr* argued the cause for petitioner. With him on the briefs were *Lawrence I. Kiern* and *Gerald A. Morrissey III*.

*Salvador J. Antonetti-Stutts*, Solicitor General of Puerto Rico, Department of Justice of the Commonwealth of Puerto Rico, was on the brief for *amicus curiae* Commonwealth of Puerto Rico in support of petitioner.

*Cory R. Cinque*, Attorney, Federal Maritime Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Amy W. Larson*, General Counsel, Federal Maritime Commission, and *Christopher Hughey*, Deputy General Counsel.

*Anne E. Mickey* argued the cause for intervenors. With her on the brief were *Heather M. Spring* and *Rick A. Rude*.

Before: SENTELLE, *Chief Judge*, KAVANAUGH, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Chief Judge* SENTELLE and *Senior Circuit Judge* WILLIAMS join.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

KAVANAUGH, *Circuit Judge:* Several commercial marine terminal operators filed complaints with the Federal Maritime Commission against the Puerto Rico Ports Authority. The Authority, which is known as PRPA, asserted sovereign immunity. A divided panel of the Federal Maritime Commission ruled that PRPA is not an arm of the Commonwealth of Puerto Rico and thus not entitled to sovereign immunity. We disagree.

PRPA was created by Puerto Rico law as a "government instrumentality of the Commonwealth of Puerto Rico." P.R. LAWS ANN. tit. 23, § 333(a). By statute, PRPA operates as a "government controlled corporation." § 333(b). It performs governmental functions "for the benefit of the people of

Puerto Rico," including managing Puerto Rico's ports and airports and regulating navigation in Puerto Rico's harbors. § 348(a). Four of PRPA's five directors are high-ranking Commonwealth officials who automatically serve on PRPA's Board by virtue of their government positions. The Governor of Puerto Rico controls the appointment of the directors; the Governor also possesses the power to remove four of the five directors at will and can remove the fifth for cause. The Board of Directors in turn appoints (and can remove at will) PRPA's Executive Director, who is currently Puerto Rico's Secretary of State. By law, moreover, the Commonwealth of Puerto Rico is responsible for paying certain potentially significant judgments arising from lawsuits targeting PRPA.

Considering those facts under the arm-of-the-state precedents of the Supreme Court and this Court, we hold that the Puerto Rico Ports Authority is an arm of the Commonwealth of Puerto Rico and is immune from suit absent its consent.

I

The Puerto Rico Ports Authority is a "government controlled corporation" and "government instrumentality of the Commonwealth of Puerto Rico" that owns and operates Puerto Rico's air and marine mass-transportation facilities and develops Puerto Rico's waterfront lands. P.R. LAWS ANN. tit. 23, §§ 333, 336, 2603. PRPA controls the movement of ships, passengers, and cargo in Puerto Rico's ports, docks, and harbor zones; regulates navigation and marine trade; issues pilot licenses; inspects ships; and leases its facilities to commercial marine terminal operators. §§ 2201, 2501, 2301, 2403, 336(*l*)(1).

In 1996, Puerto Rico's Governor decided that tourism could enhance Puerto Rico's future economic growth. The

4

Governor launched an economic development project; the goal was to redevelop San Juan's waterfront and harbor by replacing cargo operations with a new convention center and cruise-ship terminals. To further the Governor's objectives, PRPA cleared facilities along the San Juan harbor and waterfront and relocated shipping operations to other ports.

The complaints at issue here stem from PRPA's relocation of private marine terminal operators, as well as certain post-relocation practices and conditions at the new facilities. Three commercial marine terminal operators – Odyssea Stevedoring of Puerto Rico, the International Shipping Agency, and San Antonio Maritime Corporation – filed separate complaints with the Federal Maritime Commission, an agency within the Executive Branch of the U.S. Government. The marine terminal operators alleged that PRPA's marine terminal leasing practices violated the federal Shipping Act of 1984, 46 U.S.C. §§ 41102(c), 41104, 41106. They contended that PRPA: (1) failed to establish reasonable receiving, handling, storing, or delivering practices; (2) gave other customers undue or unreasonable preferences; and (3) unreasonably refused to deal or negotiate with them. The marine terminal operators sought more than $100 million in total damages and a cease-and-desist order prohibiting PRPA from continuing to violate the Shipping Act.

PRPA filed motions for summary judgment, arguing that it is an arm of the Commonwealth and that sovereign immunity therefore barred adjudication of the complaints.

By a 3-2 vote, a divided Federal Maritime Commission held that PRPA is not "an arm of the Commonwealth, and is therefore not entitled to sovereign immunity from the regulatory adjudication of privately-filed complaints before the Federal Maritime Commission." *Odyssea Stevedoring of*

5

*P.R., Inc. v. PRPA*, at 1, Nos. 02-08, 04-01, 04-06 (Fed. Mar. Comm'n Nov. 30, 2006) (Order), Joint Appendix ("J.A.") 158. Commissioners Brennan and Creel dissented, stating that "the facts relating to control, statewide concerns, and state-law treatment of the entity," among other things, established that PRPA is an "arm of the Commonwealth of Puerto Rico." Order at 47 (Brennan and Creel, Commissioners, dissenting), J.A. 204.

PRPA now petitions for review of the Commission's order.

II

A

The text of the Eleventh Amendment does not expressly provide for state sovereign immunity; the text merely denies federal court jurisdiction over suits against one State by citizens of another State. But under long-standing Supreme Court precedent, the Constitution has been interpreted to encompass a principle of state sovereign immunity and to largely shield States from suit without their consent. *See Alden v. Maine*, 527 U.S. 706, 745-46 (1999); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Hans v. Louisiana*, 134 U.S. 1, 20-21 (1890). The Supreme Court has held that sovereign immunity bars not only the courts but also federal agencies such as the Federal Maritime Commission from adjudicating complaints against non-consenting States. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 n.6, 760 (2002). As we have held and as the parties here agree, moreover, the Puerto Rican Federal Relations Act grants Puerto Rico the same sovereign immunity that the States possess from suits arising under

6

federal law. *Rodriguez v. P.R. Fed. Affairs Admin.*, 435 F.3d 378, 381-82 (D.C. Cir. 2006); *see also* 48 U.S.C. § 734.[1]

Even where, as here, the State itself is not a named party, sovereign immunity bars suits against an arm of the State. *See, e.g.*, *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 32-34 (1994); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Courts have held that state entities as varied as universities, transportation authorities, and port authorities can be arms of the State immune from suit. *See, e.g.*, *Doe*, 519 U.S. at 429, 431 (university); *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 219-20 (D.C. Cir. 1986) (transportation authority); *Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1054-55 (4th Cir. 1995) (port authority). Whether an entity is an arm of the State for purposes of sovereign immunity under the U.S. Constitution is a question of federal law. *See Doe*, 519 U.S. at 429 n.5.

Determining whether a particular entity is an arm of the State can be a difficult exercise. The cases generally arise in three different factual settings involving: (1) agencies that are either arms of the State or political subdivisions, such as cities or counties, that are not entitled to sovereign immunity; (2) special-purpose public corporations (like PRPA) established

---

[1] As a result, the parties agree that we need not decide whether Puerto Rico, absent the Puerto Rican Federal Relations Act and solely by virtue of its status as an American territory, otherwise would be entitled to sovereign immunity under the U.S. Constitution. *Cf. P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 141 n.1 (expressing no view on whether the Commonwealth is treated as a State for purposes of sovereign immunity); *Ramirez v. P.R. Fire Serv.*, 715 F.2d 694, 697 (1st Cir. 1983) ("Puerto Rico, despite the lack of formal statehood, enjoys the shelter of the Eleventh Amendment in all respects.").

by States to perform specific functions; these may be either arms of the State or non-governmental corporations not entitled to sovereign immunity; and (3) Compact Clause entities established by two or more States by compact and approved by Congress; these are sometimes considered arms of their constituent States for sovereign immunity purposes, although the Supreme Court has recognized a presumption against sovereign immunity for Compact Clause entities, *see Hess*, 513 U.S. at 42.[2]

The courts' arm-of-the-state analysis "has moved freely amongst these three categories, applying common principles." *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr.*, 322 F.3d 56, 61 (1st Cir. 2003). To determine whether an entity is an arm of the State, the Supreme Court and this Court have generally focused on the "nature of the entity created by state law" and whether the State "structured" the entity to enjoy its immunity from suit. *Mt. Healthy*, 429 U.S. at 280; *Hess*, 513 U.S. at 43-44; *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979); *see also Morris*, 781 F.2d at 225. That inquiry requires examination of three factors: (1) the State's intent as to the status of the entity, including the functions performed by the entity; (2) the State's control over the entity; and (3) the entity's overall effects on the state treasury. *See, e.g.*, *Hess*, 513 U.S. at 44-46; *Lake Country Estates*, 440 U.S. at 401-02; *Mt. Healthy*, 429 U.S. at 280-81; *Morris*, 781 F.2d at 224-28.

Under the three-factor test, an entity either is or is not an arm of the State: The status of an entity does not change from one case to the next based on the nature of the suit, the State's

---

[2] None of the Supreme Court's arm-of-the-state cases has considered a special-purpose public corporation like PRPA that was created by the State.

financial responsibility in one case as compared to another, or other variable factors. Rather, once an entity is determined to be an arm of the State under the three-factor test, that conclusion applies unless and until there are relevant changes in the state law governing the entity.

B

We applied this three-factor test in *Morris v. Washington Metropolitan Area Transit Authority*, 781 F.2d 218 (D.C. Cir. 1986). The marine terminal operators and the Commission suggest that the *Morris* approach does not apply in the same way after the Supreme Court's later decision in *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994). They contend that the arm-of-the-state inquiry now focuses largely if not entirely on the entity's financial impact on the state treasury and whether the State must pay judgments against the entity. That argument misreads *Hess*, however.

Consistent with prior cases, the *Hess* Court stated that an entity is an arm of the State entitled to sovereign immunity if the State "structured" the entity to be an arm of the State – a question determined by looking at state intent, including the entity's functions; state control; and the entity's overall effects on the state treasury. *Id.* at 43-46. In considering the status of a Compact Clause entity formed by New York and New Jersey, the *Hess* Court found some indicators of state *control* of the Port Authority, but it found neither the requisite state *intent* to treat the Port Authority as an arm of the State nor any effect on the state *treasury* from the Port Authority. *See id.* at 44-46. As to intent, the Court pointed out that "[t]he compact and its implementing legislation do not type the Authority as a state agency." *Id.* at 44. As to effect on the treasury, the Court noted that "the States lack financial responsibility for the Port Authority. Conceived as a fiscally independent entity

financed predominantly by private funds, the Authority generates its own revenues, and for decades has received no money from the States. . . . The States . . . bear no legal liability for Port Authority debts; they are not responsible for the payment of judgments against the Port Authority . . . ." *Id.* at 45-46 (citation omitted). Based on its examination of the factors of intent, control, and overall effects on the treasury, and applying the presumption against sovereign immunity for Compact Clause entities, the Court concluded that the indicators were sufficiently mixed as not to mean the Port Authority was an arm of the States of New York and New Jersey.

We thus read *Hess* in much the same way as did Judge Lynch's thorough First Circuit opinion in *Fresenius Medical Care Cardiovascular Resources, Inc. v. P.R. & the Caribbean Cardiovascular Ctr.*, 322 F.3d 56 (1st Cir. 2003). Applying *Hess*, the *Fresenius* court examined multiple factors, including state intent and control, in assessing whether the State "clearly structured the entity to share its sovereignty." *Id.* at 68. As the *Fresenius* court correctly stated, *Hess* does not require a focus solely on the financial impact of the entity on the State. Rather, *Hess* "pays considerable deference to the dignity interests of the state, focusing on both explicit and implicit indications that the state sought to cloak an entity in its Eleventh Amendment immunity." *Id.* at 67.[3]

---

[3] The marine terminal operators and the Commission point to older First Circuit precedents holding that PRPA's immunity turns on the nature of its activities giving rise to the case, whether proprietary or governmental functions. *See Royal Caribbean Corp. v. PRPA*, 973 F.2d 8, 9 (1st Cir. 1992); *PRPA v. M/V Manhattan Prince*, 897 F.2d 1, 12 (1st Cir. 1990). But the First Circuit has expressly departed from that narrow focus on governmental-versus-proprietary functions as the test for assessing the sovereign

In sum, *Hess* confirms that we must apply the three-factor arm-of-the-state test and look to state intent, state control, and overall effects on the state treasury.

## III

To determine whether PRPA qualifies as an arm of the Commonwealth under the sovereign immunity precedents, we now turn to the three relevant factors – the Commonwealth's intent as to the status of PRPA, the Commonwealth's control over PRPA, and PRPA's overall effects on the Commonwealth's treasury. *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44-46 (1994); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401-02 (1979); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977); *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 224-28 (D.C. Cir. 1986).

## A

We begin by considering Puerto Rico's intent with respect to PRPA. We assess Puerto Rico's intent by examining whether Puerto Rico law expressly characterizes PRPA as a governmental instrumentality rather than as a local governmental or non-governmental entity; whether PRPA performs state governmental functions; whether PRPA is treated as a governmental instrumentality for purposes of

---

immunity of a special-purpose corporation. In *Fresenius*, the First Circuit stated that it had "reshaped" its arm-of-the-state analysis since those earlier cases. 322 F.3d at 59; *see also Pastrana-Torres v. Corp. de P.R. Para La Difusión Pública*, 460 F.3d 124, 126 (1st Cir. 2006); *Breneman v. United States ex rel. FAA*, 381 F.3d 33, 39 (1st Cir. 2004); *Redondo Constr. Corp. v. P.R. Highway & Transp. Auth.*, 357 F.3d 124, 126 (1st Cir. 2004).

other Puerto Rico laws; and Puerto Rico's representations in this case about PRPA's status. *See Hess*, 513 U.S. at 44-45; *Lake Country Estates*, 440 U.S. at 401-02; *Mt. Healthy*, 429 U.S. at 280; *Morris*, 781 F.2d at 224-25.

*Whether Puerto Rico Law Expressly Characterizes PRPA as a Governmental Instrumentality:* In assessing Puerto Rico's intent as to this special-purpose public corporation, we first examine whether Commonwealth law expressly characterizes PRPA as a governmental instrumentality or instead as a local or non-governmental entity. *See Hess*, 513 U.S. at 44-45; *Lake Country Estates*, 440 U.S. at 401; *Mt. Healthy*, 429 U.S. at 280; *Morris*, 781 F.2d at 225. That's an easy inquiry. PRPA's enabling act describes PRPA as a "government instrumentality of the Commonwealth of Puerto Rico" and "government controlled corporation." P.R. LAWS ANN. tit. 23, § 333(a), (b). That statutory language plainly demonstrates Puerto Rico's intent to create a governmental instrumentality of the Commonwealth and thus strongly suggests that PRPA is an arm of the Commonwealth entitled to sovereign immunity. *See Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr.*, 322 F.3d 56, 69-70 (1st Cir. 2003) (recognizing that Puerto Rico statutes use term "instrumentality" when Puerto Rico intends to create entity as arm of the Commonwealth); *Morris*, 781 F.2d at 225 (fact that compact labels WMATA a "regional instrumentality, as a common agency of each signatory party" indicated that signatory States intended to confer immunity) (internal quotation marks omitted); *cf. Hess*, 513 U.S. 44-45 (noting that implementing legislation did not characterize entity as a state agency).[4]

---

[4] In the Supreme Court's three leading arm-of-the-state cases, unlike this case, the relevant law did *not* label the entity a state

*Whether PRPA Performs State Governmental Functions:* In considering Puerto Rico's intent, we also look to whether PRPA performs functions typically performed by state governments, as opposed to functions ordinarily performed by local governments or non-governmental entities. *See Hess*, 513 U.S. at 45; *Lake Country Estates*, 440 U.S. at 402.

The enabling act charges PRPA with developing, improving, owning, operating, and managing "any and all types of air and marine transportation facilities and services," as well as establishing and managing "mass marine transportation systems in, to and from the Commonwealth of Puerto Rico." § 336. The Dock and Harbor Act further provides that, with some exceptions, PRPA controls the waters, ports, docks, and harbor zones, "which are under the dominion of Puerto Rico." § 2202. That Act also vests PRPA with regulatory authority over pilot services in the harbors of Puerto Rico. §§ 2401-18. Under the Act, PRPA regulates "navigation and the marine trade" in the navigable waters of Puerto Rico, "including the inspection of ships to determine their condition of cleanliness and safety." §§ 2201, 2301.

As a general matter, these functions are governmental but "are not readily classified as typically state" as opposed to local governmental functions. *Hess*, 513 U.S. at 45. Here, however, PRPA's enabling act and Puerto Rico's Dock and Harbor Act indicate that PRPA performs its functions to promote "the general welfare" and to increase "commerce and prosperity" for the benefit "of the people of Puerto Rico." § 348(a); *see also* §§ 2109, 2202. This consideration therefore points in the direction of arm-of-the-Commonwealth status.

---

instrumentality. *See Hess*, 513 U.S. at 44-45; *Lake Country Estates*, 391 U.S. at 401; *Mt. Healthy*, 429 U.S. at 280.

*Whether PRPA Is Treated as a Governmental Instrumentality for Purposes of Other Puerto Rico Laws:* We next look to how PRPA is treated under other Puerto Rico laws. *See Hess*, 513 U.S. at 44-45; *Mt. Healthy*, 429 U.S. at 280; *Morris*, 781 F.2d at 225-28. Like other Commonwealth agencies, PRPA's internal operations are governed by Puerto Rico laws that apply to Commonwealth agencies generally, such as the Puerto Rico Administrative Procedures Act and the Puerto Rico Public Service Personnel Act. *See* Commonwealth's Amicus Br. at 8; P.R. LAWS ANN. tit. 23, §§ 336(*l*)(3), 337(a). Like other Commonwealth agencies, PRPA does not have private owners or shareholders and does not pay taxes; instead, it must submit a yearly financial statement to the legislature and Governor, and its books are examined periodically by the Controller of Puerto Rico. §§ 348, 345, 338. Those statutes, too, therefore suggest that PRPA is an arm of the Commonwealth.

*Puerto Rico's Representations in This Case About PRPA's Status:* Finally, in determining Puerto Rico's intent, we also must respect Puerto Rico's representations to this Court and to the Federal Maritime Commission. *See Lake Country Estates*, 440 U.S. at 401; *Morris*, 781 F.2d at 224-25.

In this Court, the Commonwealth filed an amicus curiae brief, signed by the Solicitor General of Puerto Rico, emphatically declaring that PRPA is an arm of the Commonwealth entitled to sovereign immunity. The Commonwealth's brief explains that PRPA is an "instrumentality of the Commonwealth" that was created in the "form of an authority, rather than a central government agency, in order to have greater flexibility" and to avoid certain restrictions on public funding. Commonwealth's Amicus Br. at 5 (internal quotation marks omitted). The Commonwealth's brief also describes the ways in which the

14

Puerto Rico legislature ensured that the Commonwealth would retain a significant degree of control over PRPA. *Id.* at 6-9. Before the Federal Maritime Commission, the Commonwealth similarly asserted that PRPA is an arm of the Commonwealth. *See Odyssea Stevedoring of P.R. v. PRPA*, at 46-47, Nos. 02-08, 04-01, 04-06 (Fed. Mar. Comm'n Nov. 30, 2006) (Brennan and Creel, Commissioners, dissenting), J.A. 203-04.

Under the governing precedents, the Commonwealth's representations that PRPA was created and intended as an arm of the Commonwealth further indicates that PRPA is in fact an arm of the Commonwealth entitled to sovereign immunity. *See Lake Country Estates*, 440 U.S. at 401; *Morris*, 781 F.2d at 224-25.[5]

In sum, with respect to the first factor in the arm-of-the-state analysis – Puerto Rico's intent – we conclude that Puerto Rico law's characterization of PRPA as a government instrumentality, PRPA's functions under Puerto Rico law, the fact that PRPA is treated like other Commonwealth agencies for purposes of other Puerto Rico laws, and Puerto Rico's representations in this case all strongly support the conclusion

---

[5] The marine terminal operators and the Commission cite a Puerto Rico *intermediate* court decision stating that PRPA is independent of the Commonwealth. *See Transcaribbean Mar. Corp. v. Commonwealth*, 2002 PR App. LEXIS 595 (P.R. Cir. 2002). But the court in that case did not say, or purport to say, that PRPA is not a governmental instrumentality or that PRPA is not an arm of the Commonwealth. In short, we agree with the Commonwealth's amicus brief that the *Transcaribbean* case is nothing more than "an entirely unremarkable application of the standard government liability framework established by Puerto Rico law." Commonwealth's Amicus Br. at 10.

that PRPA is an arm of the Commonwealth entitled to sovereign immunity.

B

We next consider the Commonwealth's "control" over PRPA, the second factor in our arm-of-the-state analysis. In considering this factor, we look primarily at how the directors and officers of PRPA are appointed. *See Hess*, 513 U.S. at 44; *Lake Country Estates*, 440 U.S. at 401; *Morris*, 781 F.2d at 227 (degree of control State exercises over agency is "significant consideration" in immunity analysis).[6]

This "control" factor also weighs heavily in the direction of considering PRPA an arm of the Commonwealth. PRPA is governed by a Board consisting of five directors. As the Solicitor General of Puerto Rico has explained in the Commonwealth's amicus brief, four directors are high-ranking governmental officials who are appointed by the Governor to their positions and who automatically become members of PRPA's Board by virtue of their offices: the Secretary of Transportation and Public Works, the Economic Development Administrator, the Secretary of Commerce, and the Executive Director of the Tourism Company. Commonwealth's Amicus Br. at 6; P.R. LAWS ANN. tit. 23, § 334. Those four officials perform their services for PRPA as part of their official government duties; they receive no extra or separate compensation for their Board activities. Tr. of Oral Arg. at 35. By law, the Chair of the Board is the Secretary of Transportation and Public Works. § 334. The

---

[6] Even in cases where the directors and officers are not government appointees or are not removable at will by government officials, the government's statutory authority to veto an entity's proposed actions can separately indicate governmental control. *Cf. Hess*, 513 U.S. at 44; *Lake Country Estates*, 440 U.S. at 402.

fifth Board member is a "private citizen representing the public interest" who is appointed by the Governor with the consent of the Puerto Rico Senate. *Id.* In short, the Governor of Puerto Rico controls the appointment of the entire Board.

The fact that a majority of the directors are high officers of the Commonwealth who hold their directorships because of their positions in the government suffices to demonstrate that the Commonwealth (which can act only through its officers) directly controls PRPA.

And in this case, there is more: As the Solicitor General of Puerto Rico has explained, the Governor also has the power to remove *at will* four of the five members of PRPA's Board of Directors from their government offices. Commonwealth's Amicus Br. at 6-7. Upon removal, they automatically lose their seats on PRPA's Board. *Id.* The fifth Board member, the private citizen representing the public interest, is removable by the Governor for cause. §334. The Governor's power to remove a majority of the Board at will allows him to directly supervise and control PRPA's ongoing operations. *Cf. Edmond v. United States*, 520 U.S. 651, 664 (1997); *Myers v. United States*, 272 U.S. 52, 135 (1926).[7]

The Board of Directors in turn appoints PRPA's Executive Director, who is PRPA's chief executive officer. The Board also can remove the Executive Director at will. § 335. The current Executive Director is the Commonwealth's Secretary of State, a fact further demonstrating that PRPA is a part of the Government – not just on paper, but also in its actual operation.

---

[7] The marine terminal operators and the Commission do not dispute the Commonwealth's representations to this Court about how PRPA's Board members can be appointed and removed.

And there is still more indicating Commonwealth control of PRPA: The Puerto Rico Attorney General has previously opined that the Governor of Puerto Rico retains control of Puerto Rico's public corporations. 1992 Op. Atty. Gen. PR 103 (Sept. 21, 1992). That opinion confirms what the power to appoint and remove already establishes: PRPA operates subject to the direction of the Governor.

The record in this case shows, in addition, how the Commonwealth's legal control of PRPA works in practice. In 1996, Puerto Rico implemented an economic development strategy to redevelop San Juan's waterfront and make it more suitable for tourism. As part of that plan, the Governor ordered PRPA to demolish some warehouses and cargo operations in order to make room for a convention center and cruise-ship terminals. According to a former PRPA official, the Governor directed the Executive Director of PRPA and other PRPA executives to tear down certain facilities. Deposition of Victor M. Carrion (June 5, 2003), J.A. 340-41. Later, the Governor again ordered PRPA "to expedite the clearing of certain areas along the San Antonio Channel [and] the Port of San Juan." Joint Stipulation of Facts, Odyssea Stevedoring of P.R. v. PRPA, at *9-10, No. 02-08 (Fed. Mar. Comm'n), J.A. 228-29. As a result of the Governor's directives, the buildings have been demolished, tenants have been relocated, and the convention center and cruise-ship terminals have been constructed. Those circumstances well illustrate the point that PRPA operates subject to the control of the Governor. *Cf. Lake Country Estates*, 440 U.S. at 402 (States' lack of control over entity was "perhaps most forcefully demonstrated by the fact" that a State had "resorted to litigation in an unsuccessful attempt to impose its will" on the entity.).

In sum, the facts in this case more than suffice to demonstrate that the Commonwealth directly controls PRPA. The second factor in the analysis therefore strongly supports the conclusion that PRPA is an arm of the Commonwealth entitled to sovereign immunity.

C

The third factor we must consider in the arm-of-the-state analysis is PRPA's financial relationship with the Commonwealth and its overall effects on the Commonwealth's treasury.

The *Hess* Court looked to whether the States "structured" the entity "to enable it to enjoy the special constitutional protection of the States themselves." 513 U.S. at 43-44; *see also Lake Country Estates*, 440 U.S. at 401; *Mt. Healthy*, 429 U.S. at 280. That emphasis on structure indicates we must consider the entity's overall effects on the state treasury. In analyzing this third factor, in other words, the relevant issue is a State's overall responsibility for funding the entity or paying the entity's debts or judgments, *not* whether the State would be responsible to pay a judgment *in the particular case at issue*. *See Hess*, 513 U.S. at 45-46; *Lake Country Estates*, 440 U.S. at 401-02; *Mt. Healthy*, 429 U.S. at 280.

To be sure, even for entities that are *not* arms of the State, sovereign immunity can apply in a particular case if the entity was acting as an agent of the State or if the State would be obligated to pay a judgment against an entity in that case. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984); *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000). The marine terminal operators and the Commission seek to stretch that principle to also mean that there is no sovereign immunity if the State is not obligated to pay a judgment in the particular

case at issue. But that approach would inappropriately convert a *sufficient* condition for sovereign immunity into the single *necessary* condition for arm-of-the-state status. That is not the law; rather, we must apply the three-factor test to determine arm-of-the-state status, and the third factor considers the entity's overall effects on the state treasury. *See Hess*, 513 U.S. at 45-46; *Lake Country Estates*, 440 U.S. at 401-02; *Mt. Healthy*, 429 U.S. at 280.[8]

We turn then to examining PRPA's overall effects on the Commonwealth's treasury. Unlike non-governmental corporations, PRPA has no equity shareholders or private owners. Unlike some governmental agencies, however, PRPA is not financed out of the Commonwealth's general revenues. Instead, like many similarly created governmental entities, PRPA is financed largely through user fees and bonds; it was created in part to avoid Commonwealth-law limits on how much debt the Commonwealth itself can sustain. P.R. LAWS ANN. tit. 23, § 336(*l*)(1), (n); Commonwealth's Amicus Br. at 5-6; Alex E. Rogers, *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine*, 92 COLUM. L. REV. 1243, 1249-50 (1992).

---

[8] Several other circuits also examined an entity's overall effects on the state treasury when considering whether an entity was an arm of the State and gave no indication that a more case-specific determination was required. *See Ernst v. Rising*, 427 F.3d 351, 359-65 (6th Cir. 2005) (en banc); *Benn v. First Judicial Dist.*, 426 F.3d 233, 239-41 (3d Cir. 2005); *Fresenius*, 322 F.3d at 68-75; *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164-66 (10th Cir. 2000); *Thiel v. State Bar of Wis.*, 94 F.3d 399, 401 (7th Cir. 1996); *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 293-96 (2d Cir. 1996).

20

The marine terminal operators and the Commission argue that PRPA has no effect on the Commonwealth's treasury. They point to language in PRPA's enabling act that says PRPA is a "government instrumentality and public corporation with a legal existence and personality separate and apart from those of the Government and any officials thereof." P.R. LAWS ANN. tit. 23, § 333(b). They note that PRPA can "sue and be sued" and enter contracts. § 336(e), (f). They refer to a statutory provision giving PRPA "complete control and supervision of any undertaking constructed or acquired by it." § 336(d). They explain that under Puerto Rico law, PRPA's "debts, obligations, contracts, bonds, notes, debentures, receipts, expenditures, accounts, funds, undertakings and properties . . . shall be deemed to be those of said government controlled corporation, and not those of the Commonwealth of Puerto Rico." § 333(b). They cite the fact that the Commonwealth is not legally liable "for the payment of the principal or of interest on any bonds issued by the Authority." § 336(v). And they point out that PRPA does not have the power "at any time or in any manner to pledge the credit or taxing power of the Commonwealth of Puerto Rico." *Id.*

But the marine terminal operators and the Commission ignore the fact that the Commonwealth is legally liable for some of PRPA's actions. In particular, the Dock and Harbor Act makes the Commonwealth directly liable for certain torts committed by PRPA's officers, employees, or agents when they are acting in their official capacity and within the scope of their function, employment, or agency relationship. § 2303. This provision demonstrates that the Commonwealth itself has some significant financial responsibility for PRPA: Some of PRPA's actions can give rise to legal liability for the Commonwealth, and payment for judgments in those suits comes out of the Commonwealth's coffers. Indeed, the

structure here indicates a closer relationship between PRPA and the Commonwealth than if the Commonwealth were only a financial backstop to PRPA: By law, the Commonwealth is substituted for PRPA and directly responsible for PRPA's actions in certain cases. Therefore, the marine terminal operators and the Commission are factually incorrect in suggesting that PRPA's actions do not affect the state treasury.

Under governing arm-of-the-state precedents, the third factor in the analysis – PRPA's overall effects on the Commonwealth treasury – weighs in favor of finding PRPA to be an arm of the Commonwealth. *Cf. Hess*, 513 U.S. at 45-46 ("Pointing away from Eleventh Amendment immunity, the States lack financial responsibility for the Port Authority. . . . [T]hey are not responsible for the payment of judgments against the Port Authority . . . ."); *Lake Country Estates*, 440 U.S. at 402 (States not directly responsible for judgments).[9]

## IV

When considered together, the three arm-of-the-state factors – intent, control, and overall effects on the treasury – lead us to conclude that PRPA is an arm of the Commonwealth entitled to sovereign immunity.[10] The marine

---

[9] We recognize that there is no bright line for determining the point at which a State's responsibility for an entity's funds, debts, or judgments suffices to weigh in favor of arm-of-the-state status. Here, however, we think the potentially significant exposure of the Commonwealth's treasury to legal judgments points toward such status.

[10] The First Circuit in *Fresenius* found that the Puerto Rico entity in question in that case was not an arm of the Commonwealth. *See Fresenius Med. Care Cardiovascular Res.,*

terminal operators and the Commission do not argue that PRPA has waived its immunity, either because of the Commonwealth's statutory responsibility to pay certain judgments against PRPA in Commonwealth court or because of the statutory sue-and-be-sued clause. Nor would such a waiver argument prevail. *Coll. Sav. Bank v. Fla. Prepaid Secondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) ("State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation" or "merely by stating its intention to 'sue and be sued.'").

We therefore hold that PRPA is an arm of the Commonwealth of Puerto Rico entitled to sovereign immunity. We grant the petition for review of the Federal Maritime Commission's order, and we remand to the Commission with instructions to dismiss the complaints on the ground of sovereign immunity.

*So ordered.*

---

*Inc. v. P.R. & the Caribbean Cardiovascular Ctr.*, 322 F.3d 56, 75 (1st Cir. 2003). The entity considered in *Fresenius* differed in important ways from PRPA, however. In *Fresenius*, the enabling act did not label the entity a government instrumentality or corporation; here, the enabling act describes PRPA as a government instrumentality, and the *Fresenius* court itself noted that Puerto Rico has previously used the word "instrumentality" when describing an entity it intended to be an arm of the Commonwealth. *Id.* at 68-70. In *Fresenius*, the entity did not perform governmental functions; here, PRPA performs Commonwealth-wide governmental functions by managing the Commonwealth's ports and airports. *See id.* at 70-71. In *Fresenius*, the entity's employees were not covered by relevant statutory definitions of public employees; here, PRPA's employees are so covered. *Id.* at 70. In *Fresenius*, the Governor did not have the power to remove Board members; here, the Governor has the power to remove all five board members, four of them at will. *See id.* at 71.

WILLIAMS, *Senior Circuit Judge,* concurring: I join the majority's opinion in full; on the basis of the currently prevailing authorities it is entirely sound. I question, however, whether this whole trip was necessary. If I read the Court's precedents correctly, the answer is no; under the law prevailing until the 1970s, we would be rather handily finding that the Puerto Rico Ports Authority lacks sovereign immunity.

Puerto Rico created the Authority as a separate legal person with the capacity "[t]o sue and be sued." P.R. Laws Ann. tit. 23, § 336(e). One might think that this language means what it says, so that the Authority would be amenable to suit in any court of competent jurisdiction. Until fairly recently, that thought would have been correct.

Sovereign immunity has its roots in a doctrine of personal jurisdiction. See Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559 (2002). A sovereign state may choose to waive its personal immunity or to create separate legal persons that do not share the immunity. Under the old learning, courts saw such a separate legal person as obviously subject to suit.

At the time of our founding, the existence of a separate legal person, with the capacity to sue and be sued, was precisely what set certain non-immune state entities apart from the state itself. Cities, towns, and counties were all recognized as particular types of corporations, known as municipal or "public" corporations. See *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 668-69 (1819) (opinion of Story, J.). As corporations, they were "artificial person[s], existing in contemplation of law" and possessing "the capacity . . . of suing and being sued in all things touching [their] corporate rights and duties." *Id*. at 667. It was this corporate status that, at common law, had made them

amenable to suit. See, e.g., *Russell v. Men Dwelling in the County of Devon*, (1788) 100 Eng. Rep. 359, 362 (K.B.) (opinion of Kenyon, C.J.); see also *id.* at 360 (argument of counsel). Such a corporation maintained its separate identity (and thus its suability) even if the state held an unqualified financial interest in the corporation's success, see *Bank of the Commonwealth of Ky. v. Wister*, 27 U.S. (2 Pet.) 318, 323 (1829), or had delegated to it the broadest imaginable sovereign powers, see *Barnes v. District of Columbia*, 91 U.S. (1 Otto) 540, 544-45 (1875). In a decision rendered the same day as *Hans v. Louisiana*, 134 U.S. 1 (1890), the Supreme Court found it "beyond question" that Lincoln County, Nevada, was outside the scope of the state's immunity. *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890). Despite a claim that the county was an "integral part of the State," *id.*, the Court held it amenable to suit because "politically it is also a corporation created by and with such powers as are given to it by the State," including the power to "sue and be sued in all courts in like manner as individuals." *Id.* at 530-31. (Of course requests for some kinds of relief, such as for an order of specific action on state property, may render the state itself a necessary party. *Hopkins v. Clemson Agricultural College*, 221 U.S. 636, 648-49 (1911); see also *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 842-43, 858 (1824) (Marshall, C.J.); Paul M. Bator et al., Hart & Wechsler's The Federal Courts and the Federal System 1370-71 (2d ed. 1973).)

*Lincoln County* was only one in a long train of cases holding that sovereign immunity does not extend to corporations that the sovereign (i.e., a state or the federal government) has created as separate legal persons. See, e.g., *Sloan Shipyards Corp. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 567 (1922) ("The meaning of incorporation is that you have a person, and as a person one that presumably is subject to the general rules of law.");

*Hopkins*, 221 U.S. at 645 ("[N]either public corporations nor political subdivisions are clothed with that immunity from suit which belongs to the State alone by virtue of its sovereignty."); see also *id*. at 646; *Workman v. New York City*, 179 U.S. 552, 565 (1900); *Loeb v. Columbia Twp. Trs.*, 179 U.S. 472, 485-86 (1900); *Chicot County v. Sherwood*, 148 U.S. 529, 533-34 (1893); *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 6, 9 (1889); *Cowles v. Mercer County*, 74 U.S. (7 Wall.) 118, 121-22 (1868); *Weightman v. Corp. of Washington*, 66 U.S. (1 Black) 39, 49-50 (1861). Though the defendants were municipal or local corporations in the last six cases in this group, the Emergency Fleet Corporation was nationwide and Clemson appears to have been the state agricultural college for the entirety of South Carolina. Even the cases involving local corporations manifested no interest in the fact of locality, and the decision concerning Clemson cited *Lincoln County* without suggesting that it was in any way extending that case's doctrine.

Unfortunately, this longstanding bright-line rule was not to last. The first step in its demolition was a series of decisions in the 1940s establishing a clear statement rule against federal jurisdiction. Previously, the Court had construed state laws consenting to suits against a particular state officer or department to permit suits in federal courts as well, unless the terms of the consent indicated otherwise. See, e.g., *Smith v. Reeves*, 178 U.S. 436, 441 (1900) (reading California's conditional consent to suits against the state treasurer—which enabled the treasurer to insist that the action be tried in a particular state court—as naturally excluding federal suits). In 1944, however, in a suit against state tax collectors, the Court reversed this statute-specific approach in favor of a clear statement rule, requiring "a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation." *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944); see also *id*. at 55

4

(citing *Reeves*); *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 465 (1945) (applying *Read*). In *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573 (1946), the Court went so far as to read a consent to suit "in any court of competent jurisdiction" as excluding federal courts, simply because another state statute had consented to suits on a different matter "in any court of this state or of the United States." *Id.* at 575 n.1, 580.[1]

The Court took the second and critical step in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). There for the first time it passed in silence over its former rule that a state's government corporations, with a general capacity of suing and being sued in their own names, were *ipso facto* completely bereft of sovereign immunity. The defendant Board of Education conceded that state law made it a corporate body capable "of suing and being sued." See Ohio Rev. Code § 3313.17, *cited in* Brief of Petitioners, *Mt.*

---

[1] The Court established no such rule, of course, for cases concerning entities endowed by the federal government with the capacity to sue and be sued. See, e.g., *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 705 (1949) (noting that Congress had provided for amenability to suit by different means, in some cases "entrust[ing] the business of the Government to agencies which may contract in their own names and which are subject to suit in their own names," and in others "permitt[ing] suits for damages . . . in the Court of Claims"); *Reconstruction Fin. Corp. v. J.G. Menihan Corp.*, 312 U.S. 81, 83 (1941); *Fed. Hous. Admin. v. Burr*, 309 U.S. 242, 245 (1940); *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 389 (1939). Since then the rule has become somewhat more confused, see *Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 466-67 (D.C. Cir. 1999) (noting changes to the doctrine), but an applicable sue-and-be-sued provision remains fully effective, see *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

5

*Healthy*, 1976 WL 181610, at \*28. The Court nonetheless doubted whether Ohio "had consented to suit against entities such as the Board in the federal courts," *Mt. Healthy*, 429 U.S. at 279-80, citing a case from the *Great Northern* line (namely *Ford Motor*), and thus implicitly extending its cautious rule for state waivers into the context of state government corporations.[2]

Yet the Court remembered that cities and other political subdivisions were subject to suit, see *id*. at 280 (citing *Lincoln County*), even as it forgot the underlying reason for their being so. To fill the gap, *Mt. Healthy* produced a multi-factor test of family resemblance, asking whether the school board in the case at hand was "*more like* a county or city than it is like an arm of the State." *Id*. (emphasis added). It is unclear why the answer to this perhaps metaphysical question should help resolve the scope of governmental corporate persons' immunity. But by 1981 the Court took it as given that a state governmental corporate body's general capacity to sue and be sued did not exclude the entity from the state's personal immunity. See *Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981) (citing *Smith v. Reeves*); see also *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).[3]

---

[2] *Ford Motor* had concerned a special authorization of tax refund suits against the Indiana Department of the Treasury. See 323 U.S. at 465 & n.8.

[3] *Mt. Healthy* thus created a divergence in the treatment of state and federal entities. Federal ones are generally governed by the previous doctrine, see *supra* note 1, while a wholly separate principle applies to state entities.

Since then, the law of arm-of-the-state immunity has only become more labyrinthine. See generally *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994); *Morris v. Wash. Metro. Area Transp. Auth.*, 781 F.2d 218 (D.C. Cir. 1986). Under the old rule of *Hopkins*, by contrast, the only jurisdictional inquiry necessary in such a case would be to examine the entity's organic statute and determine whether it was a corporation and legal person capable of appearing in its own name. As it happens, not only was the Authority given the power to sue and be sued, it was established as a "public corporation with a legal existence and personality separate and apart from those of the Government [of Puerto Rico] and any officials thereof." P.R. Laws Ann. tit. 23, § 333(b). So in the days before *Mt. Healthy* the jurisdictional issue here would have been easy.

As an inferior tribunal, however, we are bound by the Court's decisions no matter how much unwelcome complexity they produce. I therefore concur in the majority opinion.