# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 9, 2013          Decided July 26, 2013

No. 12-1080

CITY OF OAKLAND, ACTING BY AND THROUGH ITS BOARD OF
PORT COMMISSIONERS,
PETITIONER

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

SSA TERMINALS (OAKLAND), LLC AND SSA TERMINALS,
LLC,
INTERVENORS

---

On Petition for Review of an Order
of the Federal Maritime Commission

---

*Paul M. Heylman* argued the cause for petitioner. With
him on the briefs was *Nicholas C. Stewart*.

*Tyler J. Wood*, Deputy General Counsel, Federal
Maritime Commission, argued the cause for respondents.
With him on the brief were *Joseph F. Wayland*, Acting
Assistant Attorney General, U.S. Department of Justice,
*Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys,

2

*Rebecca A. Fenneman*, General Counsel, Federal Maritime Commission, and *Elisa P. Holland*, Attorney-Advisor.

*Marc J. Fink*, *Anne E. Mickey*, and *Robert K. Magovern* were on the brief for intervenors SSA Terminals (Oakland), LLC, et al. in support of respondent.

Before: HENDERSON and BROWN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The City of Oakland manages a port on lands granted by the State of California to benefit its citizens. This arrangement implicates the public trust doctrine, an ancient delineation of the states' rights in (among other things) their tidelands. But what happens when the public trust doctrine bumps into the Eleventh Amendment? Oakland believes it is entitled to a share of the State's sovereign immunity for its management of the port and has asked us to review the Federal Maritime Commission's contrary conclusion. We agree with the Commission, however, and deny Oakland's petition.

I

A

When California joined the Union in 1850, it acquired ownership of all underwater land within its borders subject to the ebb and flow of the tide—otherwise known as "tidelands." *See Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476 (1988). This was simply a consequence of joining the Union, though California, with its miles of coast, may have benefitted more than others.

Yet California did not acquire proprietary rights in these lands; instead, under the so-called public trust doctrine, it took the tidelands in trust for its citizens. *See Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1082 (D.C. Cir. 1984). Although the trust objectives have evolved over time, California currently holds the tidelands in trust for "statewide public purposes" like commerce, navigation, fishing, natural preservation, and "other recognized uses." CAL. PUB. RES. CODE § 6009(a). *See generally Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709, 718–24 (Cal. 1983) (describing the public trust doctrine and its application in California).[1] California's authority over the tidelands is subordinate to this trust but is otherwise absolute. CAL. PUB. RES. CODE § 6009(b).

California has repeatedly exercised its authority over the tidelands by granting discrete portions to various municipalities. We are concerned with only one of these grants. In 1911, it conveyed certain stretches to the city of Oakland to be maintained as a "public harbor for all purposes of commerce and navigation." 1911 Cal. Stat. 1258.[2] Oakland did not thereby gain plenary authority over the tidelands, however; it took the land subject to the public trust, *see Nat'l Audubon Soc'y*, 658 P.2d at 721, as well as the conditions

---

[1] The doctrine is not unique to California, *see, e.g.*, *Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 452 (1892), but its contours are defined by state law. *Air Fla., Inc.*, 750 F.2d at 1082.

[2] In fact, California had already granted Oakland a stretch of land "between high tide and ship channel" in 1852, a portion of "salt, marsh and tide lands" in 1874, and a stretch of "salt marsh and tide lands" in 1909. *See* 1909 Cal. Stat. 665; 1874 Cal. Stat. 132; 1852 Cal. Stat. 180. None of this land, we are told, has anything to do with the case.

expressly enumerated in the grant, which were generally consistent with the public trust doctrine. For example, the grant included a proviso retaining for the people of California an "absolute right to fish in the waters of said harbor, with the right of convenient access to said waters over said land." 1911 Cal. Stat. at 1259.

Oakland responded to the grant in 1927 by establishing the Port Department, a municipal agency charged with "the comprehensive and adequate development of the Port of Oakland through continuity of control, management and operation." Charter of the City of Oakland § 700 (2008). The Port Department is run by the Board of Port Commissioners, a seven-member body of "bona fide" Oakland residents nominated by the city mayor and appointed and removable by the city council. *Id.* §§ 701–03. It acts "for and on behalf of" Oakland. *Id.* § 706.

It also acts subject to the oversight of California's State Lands Commission, the agency vested with "[a]ll jurisdiction and authority remaining in the State" over granted tidelands. CAL. PUB. RES. CODE § 6301.[3] The State Lands Commission monitors and audits public land grantees like the Port Department to ensure compliance with the public trust doctrine and land grant. *See id.* §§ 6009(c), 6301.

B

SSA Terminals, LLC ("SSA"), occupies three berths in the Oakland port. At some point SSA concluded the Port

---

[3] The three-member State Lands Commission consists of two statewide elected officers and one member of the governor's cabinet. *See* CAL. PUB. RES. CODE § 6101; *see also* CAL. CONST. art. 5, §§ 2, 9, 11; CAL. GOV. CODE § 13000 *et seq.*

Department failed to consider it when looking for a tenant to occupy five open berths of choice port real estate. To make matters worse, the Port Department ultimately leased those berths to one of SSA's competitors under terms more favorable than those governing SSA's lease. SSA therefore filed a complaint with the Federal Maritime Commission alleging the Port Department violated the Shipping Act. *See* 46 U.S.C. §§ 41102(c), 41106(2)–(3) (requiring marine terminal operators to follow "just and reasonable" regulations and practices, and prohibiting them from discriminating against or "unreasonably" refusing to deal with a party).

Oakland tried to, but could not, convince the Administrative Law Judge to dismiss the complaint on grounds of sovereign immunity. Much to Oakland's dismay, the Commission was equally unsympathetic and rejected its sovereign immunity argument on appeal, so Oakland filed this petition for review.

## II

The Eleventh Amendment protects states from suit without their consent. *Alden v. Maine*, 527 U.S. 706, 730 (1999). The sovereign immunity provided by the Amendment draws on principles of federalism and comity, *see Alden*, 527 U.S. at 728–29; *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997), and protects both state dignity and state solvency, *see Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 52 (1994). It restrains not only the courts, but also certain federal agencies like the Commission. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

Determining what entities are entitled to claim immunity tracks a simple constitutional line: Eleventh Amendment sovereign immunity belongs to the states. *Lake Country*

*Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 400 (1979); *see LaShawn A. v. Barry*, 87 F.3d 1389, 1393 n.4 (D.C. Cir. 1996) (en banc). This means that when the state is not named as a defendant, sovereign immunity attaches only to entities that are functionally equivalent to states (often called "arms of the state") or when, despite procedural technicalities, the suit effectively operates against the state as the real party in interest. *See N. Ins. Co. of N.Y. v. Chatham Cnty.*, 547 U.S. 189, 193 (2006); *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Lake Country Estates, Inc.*, 440 U.S. at 400. These kinds of suits may offend the state's dignity or assault its solvency no less than if the state were itself the named defendant. *See, e.g.*, *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 269–70, 281–82.

And so a puzzle. Oakland recognizes, as it must, that municipalities are not protected by the Eleventh Amendment even though they exercise a "slice of state power," *Lake Country Estates, Inc.*, 440 U.S. at 400 (internal quotation marks omitted); *see also P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 881–84 (D.C. Cir. 2008) (Williams, J., concurring), and it neither denies it is a municipality nor claims the Port Department is anything other than a municipal agency. Oakland likewise concedes it is not an arm of the State, thereby surrendering its ability to argue that the Port Department is structurally entitled to sovereign immunity. *See P.R. Ports Auth.*, 531 F.3d at 873 ("[A]n entity either is or is not an arm of the State: The status of an entity does not change from one case to the next based on the nature of the suit, the State's financial responsibility in one case as compared to another, or variable factors."). And the Port Department's funds—which are managed by the city treasurer—are used only to finance bonds, maintain and operate Port Department facilities, and compensate employees, with any surplus potentially going into Oakland's

general treasury. *See* Charter of the City of Oakland §§ 717, 720. Why, then, would Oakland be entitled to Eleventh Amendment protection?

Oakland seeks safe passage through these shoals by relying on a novel reading of the public trust doctrine. Its argument has two parts, each of which it believes sufficient to trigger the Eleventh Amendment. First, Oakland explains, the Port Department functions as a "subordinate governmental agenc[y] of the state" because the State of California exercises "virtually complete control" over Port Department's administration of the tidelands—which because of the public trust doctrine is essentially a non-delegable state duty. Pet'r's Br. 36, 38, 40 (internal quotation marks omitted). Second, Oakland reasons, any judgment against the Port Department would be paid with State funds because revenues generated from public trust lands are part of the public trust and must be used for "State purposes." Pet'r's Br. 42. Unfortunately for Oakland, its reliance on cases granting immunity to state agents adds nothing to the conversation. Those cases establish the unremarkable proposition that but for Eleventh Amendment protection, a state, which can act only through its agents, may be liable for (or otherwise impacted by) the actions of one. *See P.R. Ports Auth.*, 531 F.3d at 878–79 ("[S]overeign immunity can apply in a particular case if the entity was acting as an agent of the State or if the State would be obligated to pay a judgment against an entity in that case."); *see also Alden*, 527 U.S. at 756–57; *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) (holding that a Medicare fiscal intermediary may be immune "only to the extent that a judgment would expose the government to financial liability or interfere with the administration of government programs"). And worse, we do not think the public trust doctrine changes Oakland's Eleventh Amendment calculus: it appears California's dignity

and fisc would survive any suit against the Port Department untroubled. *See Hess*, 513 U.S. at 47 (invoking state dignity and solvency as analytical lodestars).

California retains ultimate responsibility for protecting its public trust property, *see Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453–54 (1892); *Nat'l Audubon Soc'y*, 658 P.2d at 723–24, and it may vindicate its responsibility by passing legislation modifying or terminating the tidelands grant to Oakland, *see Mallon v. City of Long Beach*, 282 P.2d 481, 487 (Cal. 1955). The legislature has in fact tweaked Oakland's grant twenty-four times during the past century, and if it revokes the grant entirely, the tidelands will revert to the State. *Id.* The same holds true for port revenues, which are part of the public trust. *City of Long Beach v. Morse*, 188 P.2d 17, 20 (Cal. 1947).

But until California exercises this authority, the Port Department will continue to manage the tidelands however it sees fit within the limits fixed by the public trust and tidelands grant. *See Nat'l Audubon Soc'y*, 658 P.2d at 723; *People ex. rel. Webb v. Cal. Fish Co.*, 138 P. 79, 83, 88 (Cal. 1913). All liability for port-related debts likewise belongs to the Port Department, and nothing in the record suggests California must or would intervene if the Port Department cannot handle its debts. *See* 1911 Cal. Stat. at 1259 (requiring Oakland to improve the port "without expense to the state"); Charter of the City of Oakland § 717(3)(Ninth) (permitting transfer of surplus revenue and income generated by the port to the "General Fund of the City" to the extent the surplus is not needed for port-related purposes).[4]

---

[4] Oakland believes a judgment against the Port Department would operate against the state treasury under California probate law, which grants trustees the right to repayment from the trust for

Thus, while the State may alter certain parameters constraining the Port Department's actions, the record contains no reason to think it can do more. Certainly none of the twenty-four amendments to the tidelands grant have affected the day-to-day management of the port.[5] *See also*

expenditures that either were "properly incurred in the administration of the trust" or that "benefited the trust." CAL. PROB. CODE § 15684. We are unpersuaded that the public trust doctrine implies a trust relationship within the meaning of the probate code.

[5] Through these amendments, the legislature granted additional land, reserved for itself mineral rights and the right to use the land for highways, permitted Oakland to convey land to various military and educational institutions, extended the allowed length of granted franchises and leases, approved land use relating to other public trust purposes and certain land exchanges, and authorized use of revenue generated by public trust land for certain additional purposes that would nonetheless promote the public trust. *See* 2005 Cal. Stat. 5244; 2004 Cal. Stat. 4233; 1986 Cal. Stat. 5065; 1981 Cal. Stat. 3919; 1965 Cal. Stat. 3892; 1961 Cal. Stat. 2553; 1960 Cal. Stat. 319; 1957 Cal. Stat. 1902; 1955 Cal. Stat. 1936; 1953 Cal. Stat. 1908; 1945 Cal. Stat. 686; 1943 Cal. Stat. 2189; 1941 Cal. Stat. 2236; 1939 Cal. Stat. 1261; 1939 Cal. Stat. 1260; 1939 Cal. Stat. 1258; 1937 Cal. Stat. 2500; 1937 Cal. Stat. 752; 1937 Cal. Stat. 335; 1937 Cal. Stat. 115; 1931 Cal. Stat. 1346; 1923 Cal. Stat. 416; 1919 Cal. Stat. 1088; 1917 Cal. Stat. 63. Suggestively, one of these modifications purported to permit, but not require, Oakland to convey particular parcels of the public trust lands to the State for various transportation projects. *See* 1937 Cal. Stat. 335 (characterizing the legislation as an "urgency measure necessary for the immediate preservation of the public peace, health and safety"). If the legislature has the sort of control Oakland believes, one might wonder why it did not just reach out and take the land. Of course, if the State can modify Oakland's land grant, one might also wonder whether it could simply run the port directly—but we have no reason to explore these what-ifs.

CAL. PUB. RES. CODE § 6308 (requiring joinder of the state as a "necessary party defendant" in any proceeding "*involving the title to or the boundaries of* tidelands" (emphasis added)). To the extent the State *can* do more, its power appears to derive from the State's general relationship with municipalities rather than the public trust doctrine. *See, e.g.*, *Mallon*, 282 P.2d at 487. And that is not enough to claim the attention of the Eleventh Amendment. *See Hess*, 513 U.S. at 47.

It is perhaps for these reasons that the State Lands Commission, though vested with all of California's jurisdiction and authority over the tidelands, has limited and only indirect control of the Port Department—and apparently only to the extent necessary to ensure compliance with the public trust and land grant. *See* CAL. STATE LANDS COMM'N, PUBLIC TRUST POLICY 3 (2001); *see also* CAL. PUB. RES. CODE § 6305. If it concludes the Port Department violated the terms of the public trust or land grant, it may advise the Port Department of that fact, report the violation to the state legislature, or sue to enjoin the violation. CAL. STATE LANDS COMM'N, PUBLIC TRUST POLICY 3; *see* CAL. PUB. RES. CODE § 6306. The State Lands Commission, as the California attorney general put it in an amicus brief to the Commission, is simply the legislature's "day-to-day eyes and ears." Far from establishing an agency relationship, California's relationship with the Port Department—its ability to control Oakland's management of the port only to the extent Oakland violates the public trust or tidelands grant—suggests the opposite. *See, e.g.*, RESTATEMENT (THIRD) OF AGENCY §§ 1.01 cmts. f, g, 1.04(10) (2006).

Without any record evidence suggesting suits against the Port Department effectively target the State of California, we will not distort the Eleventh Amendment by mantling

11

Oakland with sovereign immunity. *Cf. Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003) ("It would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty."). The State of California had the opportunity to claim a dignity or financial interest when the Commission invited it to submit an amicus brief explaining the Port Department's status under state law, but nowhere did the State assert any interest in Oakland's immunity—a strong signal that California does not view suits against the Port Department as a threat to its sovereign interests. *Cf. Lake Country Estates, Inc.*, 440 U.S. at 401, 407 (looking to state briefs disclaiming intent to confer immunity on bi-state compact); *Morris v. Wash. Metro Area Transit Auth.*, 781 F.2d 218, 224–25 (D.C. Cir. 1986) (similar). Indeed, the State spoke up only after the Commission affirmatively asked it to do so, and it fell silent after Oakland filed its petition for review. This is telling and, we think, representative of Oakland's rights in and responsibilities for the tidelands.

III

For the reasons stated, Oakland's petition for review is

*Denied.*