# United States Court of Appeals
## For the First Circuit

No. 15-1278

DANIEL GRAJALES, WANDA I. GONZÁLEZ,
CONJUGAL PARTNERSHIP GRAJALES-GONZÁLEZ,

Plaintiffs, Appellants,

v.

PUERTO RICO PORTS AUTHORITY,

Defendant, Appellee,

MIGUEL ALCOVER; ELMER EMERIC; GONZALO GONZÁLEZ-SANTINI; ÁLVARO
PILAR-VILAGRÁN; CARLOS TRAVIESO; and MANUEL VILLÁZAN-LIG-LONG,
each in his personal and official capacities,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before
Thompson, Hawkins,* and Barron,
Circuit Judges.

Eugenio W.A. Géigel-Simounet, with whom Géigel-Simounet Law
Offices C.S.P. was on brief, for appellants.
Jorge Martínez-Luciano, with whom Martínez-Luciano &
Rodríguez-Escudero Law Office was on brief, for appellee.

July 26, 2016

---

* Of the Ninth Circuit, sitting by designation.

**BARRON**, <u>**Circuit Judge**</u>. State-created public corporations serve a range of special purposes. Sometimes states structure these entities to be so closely tied to the state government -- in terms, among other things, of how they are funded and how they are supervised -- that they are properly understood to be "arms" of the state itself. As a result, such entities may claim the very same sovereign immunity from suit that the state enjoys under the Eleventh Amendment of the United States Constitution. Sometimes, however, states structure these entities to operate at such a remove from the state government that they are not properly understood to be arms of the state. When states set up such entities in that way, they are not entitled to share in the state's immunity.

What is true of states is also true of the Commonwealth of Puerto Rico. It, too, we have held, is entitled to assert the sovereign immunity that states enjoy. It, too, has created a number of special-purpose public corporations. And, it, too, has structured some of them to be very closely tied to the Commonwealth government and some to operate separate and apart from it.

Unfortunately, it is not always easy to tell whether a sovereign has structured one of its special-purpose public corporations to be an "arm." Disputes over classification thus frequently arise, such as this one, in which we must decide whether one of the Commonwealth's special-purpose public corporations, the

Puerto Rico Ports Authority ("PRPA"), is an arm of the Commonwealth.

We have twice before -- albeit decades ago -- addressed PRPA's status. In each case, we reached a different conclusion based on the distinct nature of the particular function that PRPA was performing that gave rise to the underlying suit. After we decided those cases, however, we refined our arm-of-the-state analysis in response to intervening Supreme Court precedent. In this case, based on that refined analysis and the arguments that PRPA makes to us, we conclude that PRPA is not entitled to assert the Commonwealth's immunity as an arm of the Commonwealth. Accordingly, we reverse the District Court's order of dismissal and remand for further proceedings.

## I.

Puerto Rico law established the Puerto Rico Transportation Authority as a public corporation in 1942. P.R. Laws Ann. tit. 23 § 331. In 1955, Puerto Rico renamed the entity the Puerto Rico Ports Authority. Id. § 332(a). The special purposes that PRPA is charged with performing are "to develop and improve, own, operate, and manage any and all types of air and marine transportation facilities and services, as well as to establish and manage mass marine transportation systems in, to and from the Commonwealth of Puerto Rico on its own, or in coordination

- 3 -

with other government, corporate or municipal entities."
Id. § 336.

The plaintiffs are Daniel Grajales and his family. Their suit arises from events that allegedly occurred after PRPA transferred Grajales, who had served as PRPA's Interagency Coordinator for Emergency Management, to the position of Supervisor of Security at the Aguadilla Airport in Aguadilla, Puerto Rico.

The plaintiffs allege that from 2009 to 2011, the defendants -- which include not only PRPA, but also various PRPA officials who are not parties to this appeal -- subjected Grajales to "persecution, prosecution, harassment, unfair working conditions and a hostile working environment" due to his political affiliation.[1] The plaintiffs also allege that Grajales was unlawfully terminated from his employment with PRPA on May 20, 2011, for reasons related to political discrimination and retaliation. As to retaliation, the plaintiffs allege that Grajales was terminated on account of his perceived involvement in the filing of a complaint with the Occupational Safety and Health

---

[1] Grajales is a member of the Popular Democratic Party and the individual defendants are allegedly members of the New Progressive Party. The PDP lost the general election in November 2008 and the NPP assumed office thereafter. See Grajales v. P.R. Ports Auth., 682 F.3d 40, 43 (1st Cir. 2012).

Administration about the procedures used by airport personnel to fix lights at the airport.

This case has a lengthy and complicated procedural history, with many twists and turns. These include the plaintiffs' filing of four complaints, each of which raised a variety of federal and Puerto Rico law claims; the reversal by this Court of the District Court's grant of the defendants' motion for judgment on the pleadings, see Grajales v. P.R. Ports Auth., 682 F.3d 40, 50 (1st Cir. 2012); the District Court's subsequent denial of the defendants' motion for summary judgment; a trial that resulted in jury deadlock as to the retaliation claim; the entry of default against PRPA; and the transfer of the case from one judge to another.

Notably, PRPA did not assert Eleventh Amendment immunity until March 27, 2014, after default was entered against PRPA but before the entry of default judgment. PRPA asserted its immunity in a motion to dismiss the plaintiffs' then remaining claims against PRPA. The District Court granted that motion on January 12, 2015. See Grajales v. P.R. Ports Auth. ("Grajales II"), 81 F. Supp. 3d 158, 166 (D.P.R. 2015).[2]

---

[2] The District Court concluded that the plaintiffs' only remaining claims were a federal political discrimination claim under 42 U.S.C. § 1983 and a Puerto Rico law retaliation claim. See Grajales II, 81 F. Supp. 3d at 166 n.7. The parties do not challenge this characterization of the remaining claims.

- 5 -

The District Court relied primarily on Puerto Rico Ports Authority v. Federal Maritime Commission ("FMC"), 531 F.3d 868 (D.C. Cir. 2008), cert. denied, 555 U.S. 1170 (2009). Grajales II, 81 F. Supp. 3d at 163-65. In FMC, the D.C. Circuit concluded that PRPA was an arm of the Commonwealth and was thus immune from suit under Eleventh Amendment immunity principles. FMC, 531 F.3d at 880. The District Court agreed, Grajales II, 81 F. Supp. 3d at 162-65, and also concluded that PRPA did not, through its course of conduct in litigation, waive its right to claim immunity, id. at 165-66.

This appeal followed. The plaintiffs do not challenge the District Court's conclusion that PRPA did not waive its right to assert immunity. The plaintiffs do challenge the District Court's conclusion that PRPA is an arm of the Commonwealth entitled to assert the Commonwealth's immunity from suit.

## II.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has explained that "[a]lthough the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, 'we have understood the

Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms.'" Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996) (omission in original) (quoting Blatchford v. Native Vill. of Noatak, 501 U.S. 775, 779 (1991)).

This "presupposition . . . has two parts: first, that each State is a sovereign entity in our federal system; and second, that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" Id. (second alteration in original) (quoting Hans v. Louisiana, 134 U.S. 1, 13 (1890)). As a result, states are shielded from suit in federal court even when sued by their own citizens. See Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).

The parties agree that, because the Commonwealth enjoys this immunity,[3] the only question that we must decide is whether

---

[3] See Jusino Mercado v. Com. of P.R., 214 F.3d 34, 39 (1st Cir. 2000) (detailing Puerto Rico's autonomous history and stating that "we consistently have held that Puerto Rico's sovereign immunity in federal courts parallels the states' Eleventh Amendment immunity"); cf. Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 274 (1913) (concluding that the Puerto Rican government's "immunity from suit without it[s] consent is necessarily inferable from a mere consideration of the nature of the P[ue]rto Rican government" and explaining that the purpose of the Foraker Act in regard to Puerto Rico was to "'confer[] an autonomy similar to that of the states'" (quoting Gromer v. Standard Dredging Co., 224 U.S. 362, 370 (1912))). We note that the Supreme Court has expressly reserved on the question whether Eleventh Amendment immunity principles apply to Puerto Rico. See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 141 n.1 (1993).

PRPA may claim it.  The parties further agree that the answer turns on whether PRPA's relationship to the Commonwealth is such that PRPA is an "arm of the Commonwealth."  See Pastrana-Torres v. Corporación de P.R. para la Difusión PÚBLICA, 460 F.3d 124, 125 (1st Cir. 2006).  Our review is de novo.  Id.  PRPA bears the burden of proving that it is an "arm."  Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 99 (1st Cir. 2002).

## III.

Before turning to an examination of PRPA's status, we need to review the substantial precedent that potentially bears on how we should conduct our analysis.  We thus start with our two prior decisions that directly addressed whether PRPA is an arm of the Commonwealth but that reached opposite, case-specific outcomes.  We then describe how, in light of subsequent Supreme Court decisions, our arm-of-the-state precedent has developed in the years since we decided those cases.  Finally, we describe both the D.C. Circuit case that the District Court relied on in concluding that PRPA is an arm of the Commonwealth and the District Court decision itself.  Both the D.C. Circuit and the District Court concluded that our prior precedents examining PRPA's status deployed an analysis that no longer is applicable.

## A.

We first addressed whether PRPA qualifies as an arm of the Commonwealth in Puerto Rico Ports Authority v. M/V Manhattan

- 8 -

Prince ("Prince"), 897 F.2d 1 (1st Cir. 1990).  We did so in connection with a suit that sought to hold PRPA vicariously liable for the negligence of a certain type of ship pilot who had been involved in a ship's collision into a dock.  Id. at 2-3.[4]

To determine PRPA's status, we relied on a multi-factor framework drawn from our decision in Ainsworth Aristocrat Int'l Party Ltd. v. Tourism Co. of P.R. ("Ainsworth"), 818 F.2d 1034, 1037 (1st Cir. 1987).  See Prince, 897 F.2d at 9.  Accordingly, we described how Puerto Rico law characterized PRPA's status, listed the various powers and functions of PRPA, and provided a brief account of PRPA's fiscal relationship to the Commonwealth.  Id. at 9-10.  After reviewing those aspects of PRPA, we concluded that "whether the PRPA is entitled to eleventh amendment protection depends upon the type of activity it engages in and the nature of the claim asserted against it."  Id. at 10.

Turning to those features of the case, we explained that the pilot in question was not acting as an agent of PRPA and that PRPA's relationship to the pilot was like that of a regulator. Id. at 12.  We then held that, in light of the governmental nature of the function for which the suit was seeking to hold PRPA liable, PRPA was acting as an arm of the Commonwealth and thus that PRPA

---

[4] The pilot in question was a so-called "compulsory pilot." Prince, 897 F.2d at 3.  Compulsory pilots are responsible for coordinating the safe passage of ships into and out of Puerto Rico harbors.  See id. at 10; P.R. Laws Ann. tit. 23 §§ 2404, 2412.

- 9 -

was entitled to assert the Commonwealth's immunity from that suit. Id.

Two years later, in Royal Caribbean Corp. v. Puerto Rico Ports Authority, 973 F.2d 8 (1st Cir. 1992), we considered PRPA's claim that it was entitled to immunity, as an arm of the Commonwealth, from a suit that alleged that PRPA had negligently maintained a dock. Id. at 9. We again relied on the multi-factor framework set forth in Ainsworth. Id. (citing Ainsworth, 818 F.2d at 1037).

We found that PRPA acted as a proprietor rather than as a regulator in maintaining the docks; that PRPA generally "operate[d] with a considerable degree of autonomy," id. at 11, consistent with its denomination as a "public corporation" with a "legal existence and personality separate and apart from those of the Government," P.R. Laws Ann. tit. 23 § 333(b); that PRPA (and not the Commonwealth) would likely pay any adverse judgment in the event that PRPA were not immune; and that PRPA enjoyed a great deal of fiscal independence from the Commonwealth. Royal Caribbean, 973 F.2d at 10-12. We concluded that these facts weighed against deeming PRPA to be an arm of the Commonwealth. Id. In particular, we concluded that PRPA's general fiscal independence from the Commonwealth and the Commonwealth's lack of potential liability in the suit at hand weighed "heavily" against deeming PRPA to be an arm of the Commonwealth. Id. at 11. We

- 10 -

further concluded that these facts outweighed the facts that favored PRPA's claim to arm-of-the-Commonwealth status -- namely, the fact that the Commonwealth exercised a meaningful amount of control and supervision over PRPA and the fact that PRPA was generally charged with advancing the interests of the Commonwealth. Id. at 11-12.

We thus held in Royal Caribbean that, notwithstanding our holding in Prince, PRPA was not entitled to assert immunity, as an arm of the Commonwealth, from the suit then before us. We attributed the difference between that holding and the one in Prince to the fact that the "relevant 'type of activity'" PRPA was performing was "fundamentally different" in the two cases. Id. at 12 (quoting Prince, 897 F.2d at 10). As we put it, "[t]he difference between the primarily 'governmental function' at issue in [Prince], and the basically 'proprietary function' . . . at issue [in Royal Caribbean] explains the difference in result." Id.

A year later, in Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Authority, 991 F.2d 935 (1st Cir. 1993), on remand from 506 U.S. 139 (1993), we elaborated on the framework laid out in Ainsworth by setting forth a non-exhaustive list of seven factors that could be "mined" for determining whether an entity is an arm of the state. Metcalf & Eddy, 991 F.2d at 939-40 (citing Ainsworth, 818 F.2d at 1037). In doing so, we noted the distinct

- 11 -

outcomes that we had reached in Prince and Royal Caribbean -- each decided under the Ainsworth framework -- and "the seeming anomaly in a single agency being held to possess Eleventh Amendment immunity for some functions but not for others." Id. at 941 n.6. We explained that the different outcomes "turned on the nature of the function involved in each instance, presumably because, in light of [PRPA]'s portfolio of diverse operations, the question of access to the Commonwealth's treasury was fuliginous." Id.

**B.**

For a number of years following our decisions in Prince and Royal Caribbean, the multi-factored framework that we had set forth in Metcalf & Eddy -- a framework that accommodated our divergent (and case-specific, function-based) rulings concerning PRPA's status -- defined our approach. But, in Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico & Caribbean Cardiovascular Center Corp. ("Fresenius"), 322 F.3d 56 (1st Cir. 2003), we "refined" that approach. Id. at 68. We did so in light of the Supreme Court's intervening arm-of-the-state decision in Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30 (1994), which concerned whether the Port Authority Trans-Hudson Corporation was an arm of the states that established it (New York and New Jersey), id. at 32, 35.

Fresenius explained that, although the framework for determining arm-of-the-state status set forth in Metcalf & Eddy

was "consistent with Hess," 322 F.3d at 68, we were obliged going forward to follow the "two-step analysis" that we determined Hess had established, id. at 65. We then proceeded to describe the two steps.

The first step, Fresenius explained, "pays deference to the state's dignitary interest in extending or withholding Eleventh Amendment immunity from an entity" by examining "how the state has structured the entity." Id. This examination requires consideration of the broad range of structural indicators that Hess and Metcalf & Eddy identified as relevant. See id. at 62 n.6, 65 n.7, 68.[5] These structural indicators include how state law characterizes the entity, the nature of the functions performed by the entity, the entity's overall fiscal relationship to the Commonwealth (as opposed to whether the Commonwealth is liable for any judgment in the particular case at hand), and how much control the state exercises over the operations of the entity. Id.

Fresenius explained that if the analysis of these structural indicators reveals that "the state clearly structured the entity to share its sovereignty," then the entity is an arm of the state and the analysis is at an end. Id. at 68. But, Fresenius explained, if the structural indicators "point in different

---

[5] Fresenius also mentioned the factors described in Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401-02 (1979), as relevant to the arm-of-the-state analysis. Fresenius, 322 F.3d at 62 n.5, 68.

- 13 -

directions," id., or, as Fresenius elsewhere put it, "when there is an ambiguity about the direction in which the structural analysis points," id. at 66, the structural indicators alone cannot establish that the entity at issue is an arm of the state government, see id. at 66, 68.  In that event, Fresenius holds, we must proceed to the second step of the analysis.  Any other approach, we explained, would give insufficient respect to the dignity interest of the sovereign that created the public corporation and that may choose not to have that public corporation share in the sovereign's immunity.  Id. at 65, 68.

At the second step, according to Fresenius, the "dispositive question concerns the risk that the damages will be paid from the public treasury" and "[t]his analysis focuses on whether the state has legally or practically obligated itself to pay the entity's indebtedness" in the pending action.  Id. at 68, 72.  If the state is so obligated, then the entity may claim the state's immunity, even though the structural indicators do not themselves provide a sufficient indication that the entity is an arm of the state.  Id. at 65, 68.[6]

_____

[6] Fresenius also noted that in Auer v. Robbins, 519 U.S. 452 (1997), a post-Hess Supreme Court decision involving the arm-of-the-state doctrine, the Court concluded that the entity at issue -- a board of police commissioners -- "was not an arm of the state because the state was not responsible for the Board's financial liabilities and the only form of state control was the governor's power to appoint four of five board members." Fresenius, 322 F.3d at 67 (citing Auer, 519 U.S. at 456 n.1).

Fresenius did reference Royal Caribbean, 322 F.3d at 69, just as Hess had done, Hess, 513 U.S. at 50. But Fresenius, like Hess, did not address Royal Caribbean's emphasis on the proprietary nature of the function that PRPA was performing in the case at hand. See generally Hess, 513 U.S. 30; Fresenius, 322 F.3d 56. And Fresenius, like Hess, also did not mention our Eleventh Amendment analysis in Prince or the divergence in outcome between Royal Caribbean and Prince. See generally Hess, 513 U.S. 30; Fresenius, 322 F.3d 56.

Moreover, Fresenius did not directly address whether an entity's case-specific function is of any relevance to the analysis of the structural indicators at the first step. See generally Fresenius, 322 F.3d 56. Nor did Fresenius directly address whether, under its framework, it might be possible for an entity that, like PRPA, performs some governmental functions and some proprietary functions, see Metcalf & Eddy, 991 F.2d at 941 n.6, to be an arm of the state for purposes of suits that target the entity's performance of the former functions but not the latter ones. See generally Fresenius, 322 F.3d 56. We also have had no occasion to address that issue in subsequent cases.

**c.**

The question of PRPA's status first arose post-Fresenius outside of our Circuit. In FMC, 531 F.3d 868, the D.C. Circuit addressed PRPA's claim to immunity -- as an arm of the

- 15 -

Commonwealth -- in an administrative proceeding before the Federal Maritime Commission.  Id. at 871.  The D.C. Circuit concluded, on the basis of Fresenius, that our holdings in Prince and Royal Caribbean should be accorded little weight.  The D.C. Circuit explained that, in Fresenius, "the First Circuit . . . expressly departed from that narrow focus on governmental-versus-proprietary functions as the test for assessing the sovereign immunity of a special-purpose corporation."  Id. at 874 n.3.

In line with the first step of the Fresenius analysis, FMC assessed the structural indicators of PRPA's status as a whole.  See id. at 874-80.  The D.C. Circuit identified the relevant structural indicators as: "state intent, including the entity's functions; state control; and the entity's overall effects on the state treasury."  Id. at 873.  The D.C. Circuit concluded that all three of these structural indicators -- including the functions that PRPA had been assigned to perform, when considered as a whole -- pointed toward the conclusion that PRPA is an arm of the Commonwealth.  See id. at 874-80.  On that basis, the D.C. Circuit held that PRPA was entitled to assert the Commonwealth's immunity.  Id. at 881.

Consistent with its observation that "once an entity is determined to be an arm of the State under the three-factor test, that conclusion applies unless and until there are relevant changes in the state law governing that entity," the D.C. Circuit did not

undertake any further analysis.  Id. at 873.  As a result, the D.C. Circuit did not address the proper approach to follow in the event that the structural indicators do not send a sufficiently clear signal as to an entity's status.  Nor, in consequence of its ruling, did the D.C. Circuit engage in the second step of the Fresenius analysis, at which the question whether the pending action places the Commonwealth's fisc at risk is dispositive.[7]

And that brings us, finally, to this case, in which PRPA's status is once again in dispute.  The District Court, in addressing whether PRPA is an arm, concluded that FMC was right to give little weight to our prior holdings about PRPA's status because they focused too narrowly on the particular function that PRPA was performing in the case at hand.  Grajales II, 81 F. Supp. 3d at 162-63.  The District Court thus followed FMC in concluding

_____

[7] The D.C. Circuit did state that an entity that does not otherwise qualify as an arm of the state may nevertheless be immune "in a particular case if the entity was acting as an agent of the State or if the State would be obligated to pay a judgment against an entity in that case."  FMC, 531 F.3d at 878-89 (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 n.11 (1984) (invoking principles of the real-party-in-interest doctrine), and Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) (citing principles of agency law)); see also City of Oakland ex rel Bd. of Port Comm'rs v. Fed. Mar. Comm'n, 724 F.3d 224, 227 (D.C. Cir. 2013) ("[W]hen the state is not named as a defendant, sovereign immunity attaches only to entities that are functionally equivalent to states (often called 'arms of the state') or when, despite procedural technicalities, the suit effectively operates against the state as the real party in interest.").  This inquiry thus may mirror the second step of the Fresenius analysis.

that, under Fresenius, the proper focus was on the structural indicators of PRPA's status, broadly considered. Id. The District Court also followed FMC in concluding that PRPA was an arm of the Commonwealth in consequence of the evidence of the Commonwealth's intent, including PRPA's functions; the Commonwealth's control over PRPA; and the nature of the fiscal relationship between PRPA and the Commonwealth government. See id. at 162-65. In addition, the District Court agreed with the D.C. Circuit's conclusion that an entity determined to be an arm of the Commonwealth on the basis of the structural indicators could not lose that status in a particular case. Id. at 162-63.[8]

**IV.**

With that background in place, we are now in a position to review PRPA's status. In doing so, we do not treat as dispositive -- as Prince and Royal Caribbean appear to suggest that we should -- the nature of the particular function that PRPA was performing that gave rise to the plaintiffs' claims in this suit. In fact, neither party asks us to adopt such a limited focus. Nor does either party even attempt to classify the not-

---

[8] Two other district courts have held, on the basis of FMC, that PRPA is an arm of the Commonwealth. See Del Valle Grp. v. P.R. Ports Auth., 756 F. Supp. 2d 169, 174-75 (D.P.R. 2010) (citing FMC, 531 F.3d at 874-80); Orocovis Petroleum Corp. v. P.R. Ports Auth., Civil No. 08-2359, 2010 WL 3981665, at *2 (D.P.R. Oct. 5, 2010) (citing FMC, 531 F.3d at 874-81).

obviously-classifiable function that PRPA performed here, which concerns PRPA's employment of an airport security supervisor.

Rather than assert that this function is governmental, as in Prince, 897 F.2d at 12, or proprietary, as in Royal Caribbean, 973 F.2d at 10, the parties ask us only to determine PRPA's status with reference to Fresenius's two-step analysis and without regard to the particular function that PRPA was performing here. We proceed accordingly.[9]

---

[9] With respect to our two prior precedents assessing PRPA's status, PRPA argues only that the structural indicators that Fresenius requires us to consider reveal PRPA to be an arm of the Commonwealth; that Royal Caribbean does not permit us to reach a different conclusion; and that Prince accords with the conclusion that PRPA is an arm (though PRPA does not argue that Prince controls the outcome here). The plaintiffs, by contrast, make no reference to Prince and instead argue only that, under the framework that Fresenius establishes, PRPA was not structured to be an arm of the Commonwealth and that this conclusion accords with our decision in Royal Caribbean. Thus, the parties do not ask us to decide whether it is possible -- as our pre-Fresenius precedents contemplate -- that PRPA could be immune in the performance of functions such as those identified in Prince but not in the performance of functions such as those identified in Royal Caribbean. Nor does either party contend that the outcome here depends on our deciding whether a sovereign may structure an entity to be an arm only when performing certain functions and not when performing others or whether, instead, a sovereign must be deemed to have structured an entity to be an arm in all cases so long as it structures the entity to be an arm in one case. Given the importance of that more general question, and the absence of briefing on it, we decline to resolve it here. We do note, though, that to the extent that dicta in the District Court's decision -- or in FMC -- could be read to suggest that a sovereign may not structure an entity to be a hybrid, see Grajales II, 81 F. Supp. 3d at 162-63; FMC, 531 F.3d at 873, we question why that would be the case, given basic federalism principles and that a sovereign may waive its Eleventh Amendment immunity if it wishes. See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense

- 19 -

Just as Fresenius instructs, we first consider the full range of "structural indicators" of PRPA's status, 322 F.3d at 65, to see whether they demonstrate that the Commonwealth "inten[ded]" for PRPA to be its arm.  See Redondo Constr. Corp. v. P.R. Highway & Transp. Auth., 357 F.3d 124, 126 (1st Cir. 2004).  We then turn to the second step of the analysis, as we conclude that the structural indicators do not show that the Commonwealth "clearly structured [PRPA] to share its sovereignty."  Fresenius, 322 F.3d at 68.  Finally, at this second step, we conclude that the Commonwealth did not "legally or practically obligate[] itself to pay [PRPA's] indebtedness" in the pending action.  Id. at 68, 72.  We thus conclude that PRPA may not assert the Commonwealth's immunity from this suit.

**A.**

The first structural indicator is Puerto Rico law's characterization of PRPA.  We focus on PRPA's enabling act (the "Act").  P.R. Laws Ann. tit. 23 § 331, et seq.[10]  Like the enabling

---

Bd., 527 U.S. 666, 675 (1999) ("We have long recognized that a State's sovereign immunity is 'a personal privilege which it may waive at pleasure.'" (quoting Clark v. Barnard, 108 U.S. 436, 447 (1883))); see also Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 427 n.2 (1997) (expressly reserving on the question "whether there may be some state instrumentalities that qualify as 'arms of the State' for some purposes but not others").

[10] The parties point to no decisions of the Puerto Rico Supreme Court that purport to characterize PRPA's status, and we are not aware of any.  We are aware that, in 2007, the Commonwealth of Puerto Rico filed an amicus brief in the FMC litigation in which it stated that it "specifically agree[d]" with PRPA that PRPA was

act in Fresenius, this one "does not by its terms structure [PRPA] to be an arm of the [Commonwealth]." Fresenius, 322 F.3d at 68. We thus need to determine what signals the Act nevertheless sends.

In Fresenius, we concluded that, far from indicating that the public corporation at issue was structured to be an "arm," the relevant Puerto Rico enabling act characterized the entity in terms that "suggest[ed] exactly the opposite." Id. There, the act referred to the entity as one "independent and separate from any other agency or instrumentality of the Government of the Commonwealth of Puerto Rico." P.R. Laws Ann. tit. 24 § 343a (emphasis added).

Following Fresenius, we addressed another Puerto Rico enabling act that, like the one in Fresenius, did not expressly characterize the public corporation at issue as an arm of the Commonwealth. See Pastrana-Torres, 460 F.3d at 126-27 & n.2. Rather, the relevant Puerto Rico enabling act referred to the entity as a "public corporation" and "an instrumentality of the Commonwealth of Puerto Rico . . . with a juridical personality that is independent and separate from any other entity, agency,

_____

an arm of the Commonwealth "for purposes of the claims raised against it" in the FMC suit. See Amicus Br. of Com. of P.R. at 3, FMC, 531 F.3d 868, 2007 WL 2344794; see also Lake Country Estates, Inc., 440 U.S. at 401. But the Commonwealth has not expressed a view as to PRPA's status in this suit, and neither party contends that we should interpret the Commonwealth's amicus brief in FMC as an indication that the Commonwealth presently views PRPA to be an arm for purposes of this suit.

department or instrumentality of the Government of Puerto Rico." P.R. Laws Ann. tit. 27 § 501. Relying on Fresenius, we concluded that this language also suggested that the public corporation at issue was not an arm. Pastrana-Torres, 460 F.3d at 126-27 & n.2.

The language of PRPA's enabling act differs in some ways from the language in the enabling acts in Fresenius and Pastrana-Torres. The Act describes PRPA as "a government instrumentality and public corporation with a legal existence and personality separate and apart from those of the Government and any officials thereof." P.R. Laws Ann. tit. 23 § 333(b) (emphasis added). But by describing the entity not only as an instrumentality of government but also as one that exists "separate and apart" from the "Government," the Act sends at least as strong a signal that PRPA is not an arm as the enabling acts in Fresenius and Pastrana-Torres sent about the status of the public corporations in those cases.

Moreover, in Royal Caribbean, we indicated that the description of PRPA as a "public corporation" with a legal existence "separate and apart" from the "Government" was not, apparently, an insignificant one for purposes of determining PRPA's status. Rather, we explained that this description fit with the fact that the Act empowered PRPA to "operate[] with a considerable degree of autonomy" relative to other Commonwealth-created entities and thus accorded with the conclusion that the

Commonwealth did not consider PRPA to be an arm. Royal Caribbean, 973 F.2d at 11.[11]

In further support of that conclusion, Royal Caribbean pointed to the Act's express statement that the debts and obligations of PRPA "shall be deemed to be those of said government controlled corporation, and not those of the Commonwealth of Puerto Rico." Id. (quoting P.R. Laws Ann. tit. 23 § 333(b)). And Fresenius, in considering this first structural indicator, emphasized that the omission of such language in the enabling act in that case made it a "closer" one than Royal Caribbean. See Fresenius, 322 F.3d at 69 (citing Royal Caribbean, 973 F.2d at 11).

Nevertheless, FMC read PRPA's enabling act to characterize PRPA in terms that sent a different signal. FMC, 531 F.3d at 875. In so concluding, FMC did not mention the Act's "separate and apart" language. Id. FMC instead placed great

---

[11] PRPA is excluded from the application of the Puerto Rico Public Service Personnel Act that applies to Commonwealth agencies, see P.R. Laws Ann. tit. 23 § 337(a); Reyes Coreano v. Director Ejecutivo, 10 P.R. Offic. Trans. 51, 56-57 & n.5 (P.R. 1980); must keep its funds in accounts segregated from the Commonwealth's treasury, P.R. Laws Ann. tit. 23 § 338; Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1210-11 (1st Cir. 1993) (identifying segregation of accounts as an indicator of non-arm status); has the power to sue and be sued; and can enter contracts in its own name and right, P.R. Laws Ann. tit. 23 § 336(a), (e), (f); Metcalf & Eddy, 991 F.2d at 939-40 (identifying "the power to sue, be sued, and enter contracts" as indicating non-arm status); Pastrana-Torres, 460 F.3d at 127 (same).

weight on the fact that the Act refers to PRPA at one point as a "government instrumentality" and at another point as a "government controlled corporation." Id. The D.C. Circuit concluded that those references made clear that PRPA had not been established "as a local or non-governmental entity" and "plainly demonstrate[] Puerto Rico's intent to create a governmental instrumentality of the Commonwealth." Id. The D.C. Circuit then concluded that, in consequence of those two references, the Act "strongly suggests that PRPA is an arm of the Commonwealth entitled to sovereign immunity." Id.

But, in keeping with our admonition that we not treat language like "government instrumentality" as "dispositive on arm-of-the-state questions," see Pastrana-Torres, 460 F.3d at 126 n.2, we must read these references in the context of the Act's full characterization of PRPA. See Fresenius, 322 F.3d at 68-69; Royal Caribbean, 973 F.2d at 11-12; Metcalf & Eddy, 991 F.2d at 941-42. After all, not all non-local, governmental entities are "arms" of the sovereign. See Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997) ("When deciding whether a state instrumentality may invoke the State's immunity, our cases have inquired into the relationship between the State and the entity in question." (emphases added)). In fact, not even all state-created public corporations that the state's governor controls qualify for that status. See Auer v. Robbins, 519 U.S. 452, 456 n.1 (1997)

- 24 -

(concluding that the entity at issue was not an arm of the state notwithstanding that four out of five of the entity's board members were appointed by the state's governor).

When we consider the descriptions of PRPA to which FMC refers in their full context, they do confirm that PRPA is what it plainly is: a government-created entity that is subject to gubernatorial control, exercises some governmental functions, and is charged with serving the Commonwealth's general welfare. See Royal Caribbean, 973 F.2d at 11-12. But, on their own, these descriptions do no more than that. In fact, Fresenius noted that "when Puerto Rico has chosen to make an entity an arm of the [Commonwealth]," it has used language that is very different from the language that we have here, such as language that refers to the entity not only as one that is an "instrumentality of the Government" but also as one that is "attached" to a component part of the Commonwealth "Government" that directly supervises it. See Fresenius, 322 F.3d at 69-70 (pointing to the description of the Puerto Rico Medical Services Administration as an "instrumentality of the Government of the Commonwealth of Puerto Rico, attached to the Commonwealth Department of Health . . . under the direction and supervision of the Secretary of Health." (emphases added) (quoting P.R. Laws Ann. tit. 24 § 342b)).

In light of the Act's description of PRPA as an entity that exists "separate and apart" from the "Government," and given

how this description matches up with the considerable "autonomy" that the Act gives PRPA relative to other Commonwealth-created entities, id. at 11, we conclude that the Act's references to PRPA on which FMC relied are not strong indicators that PRPA is an arm. Rather, we conclude that, in accord with our decisions in Royal Caribbean, Fresenius, and Pastrana-Torres, the Act is best read to characterize PRPA in terms that point away from it being an arm of the Commonwealth. This first structural indicator therefore weighs against finding PRPA to share in the Commonwealth's immunity.

### B.

Turning to the next structural indicator, we must consider the nature of the functions that PRPA carries out. Here, too, we find no indication that Puerto Rico intended PRPA to be an arm -- or, at least, no clear one.

PRPA is charged with promoting "the general welfare" and "increas[ing] commerce and prosperity . . . for the benefit of the people of Puerto Rico." P.R. Laws Ann. tit. 23 § 348(a). That description of PRPA's function does suggest that PRPA is an arm. See Royal Caribbean, 973 F.2d at 12 (noting that this aspect of PRPA's role points in favor of finding PRPA to be an arm of the Commonwealth); see also FMC, 531 F.3d at 875-76.[12] But PRPA also

_____

[12] PRPA points out in this regard that PRPA is immune from taxes. See Royal Caribbean, 973 F.2d at 12 (identifying immunity

- 26 -

has a "portfolio of diverse operations," Metcalf & Eddy, 991 F.2d at 941 n.6, that, as we have previously noted, range from governmental to proprietary. Compare Prince, 897 F.2d at 12 (describing the regulation of a certain class of ship pilots as one of PRPA's governmental functions), with Royal Caribbean, 973 F.2d at 10 (describing "dock-operating activities" as one of PRPA's proprietary functions). And, we have held, the proprietary functions are not those one expects an arm to perform. See id.

Thus, PRPA, like the port authority at issue in Hess, performs a mix of functions of which some are characteristic of arms and others are not. See Hess, 513 U.S. at 45 & n.17 (noting that the port authority performed functions that could be classified as state, municipal, and proprietary, even though the entity was broadly set up to achieve "a better co-ordination of the . . . facilities of commerce in, about and through the port of New York" (quoting N.J. Stat. Ann. § 32:1-1 (West 1990))). As a result, we conclude that, as in Hess, this structural indicator does not advance the inquiry into PRPA's status. See id. at 45.[13]

_____

from taxes as a fact weighing in favor of immunity); see also Fresenius, 322 F.3d at 69 n.14 (noting that the entity at issue was immune from taxes and identifying that fact as one that weighs in favor of immunity).

[13] As noted above, neither party has attempted to characterize the function that PRPA was performing in this case, and so we do not consider it. See supra note 8.

## C.

That brings us to the third structural indicator -- the Commonwealth's fiscal relationship to PRPA. See Fresenius, 322 F.3d at 65. Fresenius instructs us to look at the overall fiscal relationship and not narrowly at whether the Commonwealth would be liable for damages in this action. See id. at 62 nn.5-6, 65 n.7, 68; see also FMC, 531 F.3d at 878. In doing so, we must consider "whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees," Metcalf & Eddy, 991 F.2d at 939; whether and to what extent the entity receives state funding and support (i.e., the "relative size" of the Commonwealth's contribution to PRPA's budget, see Fresenius, 322 F.3d at 62 n.5), see Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401-02 (1979); "whether the state has immunized itself from responsibility for the agency's acts or omissions," Metcalf & Eddy, 991 F.2d at 940; and whether the Commonwealth bears legal liability for the entity's debts, see Hess, 513 U.S. at 45-46.

## 1.

Starting at the top of this list, PRPA has "the funding power to enable it to satisfy judgments without direct state participation or guarantees." Metcalf & Eddy, 991 F.2d at 939. The Commonwealth gave PRPA the capacity to raise its own revenue through the issuance of bonds and fees. See P.R. Laws Ann. tit.

23 § 336(*l*)(1).  The Act also requires PRPA to issue fees that "shall be sufficient, at least to . . . cover the expenses incurred by [PRPA]," which presumably include PRPA's litigation expenses;[14] to "pay principal and interests [sic] on any of [PRPA's] bonds;" and to "encourage the use of [PRPA's] facilities and services in the most ample and varied manner that is financially feasible." Id.[15]

---

[14] We note that the 2013 and 2014 financial statements for PRPA indicate that PRPA had reserved approximately $21.5 million and $22.9 million, respectively, to cover anticipated litigation costs.  Puerto Rico Ports Authority, Notes to Basic Financial Statements for the Fiscal Year Ended June 30, 2013, 47, http://www2.pr.gov/presupuestos/RecommendedBudget2014-2015/Estados%20Financieros/EF%20168.pdf; Puerto Rico Ports Authority, Notes to Basic Financial Statements for the Fiscal Year Ended June 30, 2014, 47, http://www2.pr.gov/presupuestos/PresupuestoAprobado2015-2016/Estados%20Financieros/Autoridad%20de%20los%20Puertos.pdf; see also Royal Caribbean, 973 F.2d at 10 (noting, in finding that PRPA would likely pay any adverse judgment in the event that it were not immune from suit, that PRPA's director stated that PRPA's expenses included the payment of judgments against it and that PRPA's financial statements showed that PRPA deducted $1.2 million and $76,000 for "litigation claims and settlements" in 1988 and 1989, respectively).

[15] The Act also provides that, funds permitting, PRPA must pay $400,000 per year to the government of the Commonwealth of Puerto Rico.  P.R. Laws Ann. tit. 23 § 354.  This provision governs the use of PRPA's profits or surplus, and the Supreme Court has made clear that for arm-of-the-state purposes "[t]he proper focus is not on the use of profits or surplus, but rather is on losses and debts."  Hess, 513 U.S. at 51.  Moreover, PRPA generally is entitled to retain any profits or surplus it generates.  In that sense, PRPA is not like the port authority found to be an arm of the state in Ristow v. South Carolina Ports Authority, 58 F.3d 1051, 1054 (4th Cir. 1995) (citing S.C. Code Ann. § 54-3-1020, which provides that "[a]ny and all net revenues or earnings not necessary or desirable for operation of [the South Carolina Ports

In addition, as we concluded in <u>Royal Caribbean</u>, PRPA "normally . . . has not received substantial Commonwealth financing." <u>Royal Caribbean</u>, 973 F.2d at 10. And we have no basis for concluding otherwise here, given that PRPA has provided us with no indication that this statement no longer holds true. On this record, then, this case is not one in which the entity receives "virtually all the funds needed for [its] operation" from the Commonwealth. <u>Fresenius</u>, 322 F.3d at 72; <u>see also</u> <u>Pastrana-Torres</u>, 460 F.3d at 128 ("[The entity seeking immunity] has offered no materials substantiating its assertion [that the entity's entire budget comes from a Commonwealth fund] and . . . it has the burden of proof."). Nor is it one in which the public corporation gets a majority of its funding from the Commonwealth. <u>See, e.g.</u>, <u>In re San Juan Dupont Plaza Hotel Fire Litig.</u>, 888 F.2d 940, 943-44 (1st Cir. 1989) (noting that, according to the record, "roughly 70-75 percent of the funds available to the [entity at issue] are provided by taxpayers of the Commonwealth").

Finally, PRPA generally "has immunized itself from responsibility for the agency's acts or omissions," <u>Metcalf & Eddy</u>, 991 F.2d at 940, and the Commonwealth generally bears no legal liability for the entity's debts, <u>see</u> <u>Hess</u>, 513 U.S. at 46. <u>See</u> P.R. Laws Ann. tit. 23 § 333(b); <u>id.</u> § 2303(b). Thus, these last

---

Authority's] business shall be held subject to the further action of the General Assembly").

two features of the fiscal relationship that we must consider also strongly suggest that this relationship is marked by a high degree of separation.

**2.**

PRPA does not dispute these aspects of its fiscal relationship to the Commonwealth. PRPA nevertheless contends that PRPA's fiscal connection to the Commonwealth is of a kind that indicates that PRPA was structured to be an arm. We are not persuaded.

First, PRPA notes that it has received special, discretionary appropriations from the Commonwealth. See P.R. Laws Ann. tit. 23 § 6861. But the fact that PRPA receives one-off, discretionary appropriations from the Commonwealth from time to time does not demonstrate fiscal entwinement or dependence. See Metcalf & Eddy, 991 F.2d at 940-41 & n.5.

Second, PRPA points out that the Commonwealth has provided a mechanism by which it may "act as a source of financing for PRPA's acquisition of property" and may transfer property to PRPA "under the terms and conditions . . . fixed by the Governor of Puerto Rico." P.R. Laws Ann. tit. 23 §§ 339-339a. But, again, the Commonwealth's willingness to provide PRPA discrete amounts of fiscal support, at its discretion, does not itself suffice to indicate that the fiscal relationship between the Commonwealth and

PRPA is one that reveals PRPA to be an arm.  See Metcalf & Eddy, 991 F.2d at 940-41 & n.5.

Finally, PRPA relies on the same fact on which the D.C. Circuit and the District Court relied: under the Dock and Harbor Act of 1968 (the "Dock and Harbor Act"), P.R. Laws Ann. tit. 23 § 2101, et seq., the Commonwealth is exclusively liable for paying damages for judgments that are imposed by the Commonwealth's own courts for certain actions that are taken by agents of PRPA while in the exercise of certain PRPA functions.  See id. § 2303(b).[16] The Commonwealth's responsibility to pay for such damages under § 2303(b) is not discretionary.  Nor is it discrete in a one-off sense.  Rather, § 2303(b) imposes a mandatory, continuous, and open-ended obligation (albeit one that appears to be capped in any particular suit).[17]

---

[16] In the FMC litigation, the Commonwealth represented that § 2303(b) "waives [the Commonwealth's] sovereign immunity in its own courts with respect to tort claims [arising under the provisions of the Dock and Harbor Act] based on the actions of Ports Authority employees who were acting as agents of the Commonwealth."  Amicus Br. of Com. of P.R. at 10, FMC, 531 F.3d 868, 2007 WL 2344794.

[17] In the FMC litigation, the Commonwealth represented that the government's exposure to judgments under § 2303(b) would be limited by a general damages cap of $75,000.  See Amicus Br. of Com. of P.R. at 10-11, FMC, 531 F.3d 868, 2007 WL 2344794 (indicating that § 2303(b) operates within the sovereign immunity framework established by P.R. Laws Ann. tit. 32 § 3077(c), which generally caps the Commonwealth's liability in authorized suits brought against the Commonwealth in Commonwealth courts).

We are not aware of a case that presents a fact pattern involving a fiscal tie of this kind. Nonetheless, we believe that this obligation is best understood to be simply a limited exception to the general fiscal independence that PRPA enjoys. In this respect, the specific assistance that the Commonwealth must give to PRPA under § 2303(b) is best analogized to the significant but still limited fiscal support that sovereigns sometimes provide public corporations without thereby indicating an intent to make them into arms. Cf. Metcalf & Eddy, 991 F.2d at 940 & n.5 (finding the entity at issue not to be an arm of the Commonwealth, where the entity's enabling act insulated the Commonwealth from responsibility for the entity's debts and where the Commonwealth merely "demonstrated that, when it wishes to do so, it knows exactly how to pledge the Commonwealth's resources in security for [the entity's] debts," citing discrete examples contained in P.R. Laws Ann. tit. 22 § 168 involving pledges in the amount of $33.7 million and $14.7 million).

The limitations built into § 2303(b) of the Dock and Harbor Act supports this understanding. By its terms, the act does not establish a mechanism for providing funds to satisfy PRPA's judgments without regard to the particular types of judgments of the entity or without regard to the particular aspects of the entity's operations that result in such judgments. Rather, the act generally preserves the "wall" between PRPA's liabilities

- 33 -

and the Commonwealth's fisc, see Metcalf & Eddy, 991 F.2d at 940, by making the Commonwealth liable for damages incurred by PRPA only for a specially delineated subset of PRPA's operations. See P.R. Laws Ann. tit. 23 § 2303(b).[18]

Thus, although we have held that a sovereign's general pledge to backstop the entity's debts or liabilities may properly give rise to the inference that the sovereign intends for the entity to share in its immunity,[19] such an inference is not similarly warranted here. Indeed, the Act expressly gives PRPA the means to pay for judgments not implicating § 2303(b) and

---

[18] See also Transcaribbean Mar. Corp. v. Commonwealth, 2002 P.R. App. LEXIS 595, at *9-17 (P.R. App. 2002) (certified translation at 6-10) (dismissing the Commonwealth from a suit involving actions taken under the Dock and Harbor Act because the plaintiffs' allegations concerned the exercise of the property rights of PRPA, "did not indicate that the causer of the damage was acting as an agent or officer of [the Commonwealth]," and did not otherwise sound in tort law). A certified translation of Transcaribbean can be found in the addendum to the respondents' brief in the FMC litigation. See Resp'ts Br. at 1a-10a, FMC, 531 F.3d 868, 2007 WL 2344793.

[19] See United States v. Univ. of Mass., Worcester, 812 F.3d 35, 41 (1st Cir. 2016) (noting, in the context of finding the entity at issue to be an arm of the state, that the state has "a mechanism for providing funds to satisfy judgments or settlements for which [the entity] is responsible" (citing 815 Mass. Code Regs. 5.01-.11, which establishes procedures for the payment of any settlements and judgments against the Commonwealth and its agencies)); see also Stoner v. Santa Clara Cty. Office of Educ., 502 F.3d 1116, 1123 (9th Cir. 2007) (noting that entities' entitlement to immunity was "due in part to their statutorily mandated relationship with the state, which (among other things) ma[de] the state treasury unconditionally liable to make up any budgetary shortfall encountered by either entity as a result of an adverse judgment" (emphases added)).

provides that, outside of the context of § 2303(b), the debts and obligations of PRPA are not those of the Commonwealth. See P.R. Laws Ann. tit. 23 §§ 333(b), 336(*l*)(1).

PRPA also has given us no reason to conclude that the limited direct liability of the Commonwealth under § 2303(b) represents -- in practical terms -- the kind of substantial fiscal commitment that indicates that PRPA was structured to be an arm. See Irizarry-Mora v. Univ. of P.R., 647 F.3d 9, 16 (1st Cir. 2011) (finding entity at issue to be an arm of the Commonwealth where "more than sixty percent of [the entity's] funding c[ame] from the government" and where the general mission of the entity was such that the Commonwealth would do what was necessary to "ensure the [entity's] financial viability"); Pastrana-Torres, 460 F.3d at 128. In fact, PRPA has not even given us any insight into the size of the Commonwealth's obligations under § 2303(b) as compared to the size of PRPA's own obligations to pay judgments against it.

Finally, we question the notion that, by virtue of making the Commonwealth liable for certain of PRPA's actions, § 2303(b) necessarily says something about the Commonwealth's intent with regard to whether PRPA shares its sovereign immunity. Section 2303(b) merely represents the Commonwealth's waiver of its sovereign immunity in its own courts for the damages that the Commonwealth is required to pay in a limited set of suits under the Dock and Harbor Act. Cf. Great N. Life Ins. Co. v. Read, 322

- 35 -

U.S. 47, 54 (1944) (emphasizing that courts should not read into a state's waiver of the sovereign immunity it possesses in state court an intent to waive Eleventh Amendment immunity in federal court, as that "is not consonant with our dual system" of government). And it appears that the Commonwealth itself -- and not PRPA -- would be the proper defendant in any actions in which § 2303(b) could make the Commonwealth liable for damages in its own courts, thus apparently making an inquiry into PRPA's status as an arm of the Commonwealth an unnecessary one were it to arise in any such cases.[20]

### 3.

For these reasons, we conclude that the nature of the fiscal relationship between the Commonwealth and PRPA is, overall, marked by a high degree of separation. The fiscal indicator therefore points against the conclusion that PRPA is an arm of the Commonwealth.

---

[20] See FMC, 531 F.3d at 880 ("By law, the Commonwealth is substituted for PRPA [in such actions]."); Getty Ref. & Mktg. Co. v. P.R. Ports Auth., 531 F. Supp. 396, 398 (D.P.R. 1982), vacated and remanded, 698 F.2d 1213 (1st Cir. 1982) (dismissing PRPA from action that triggered the Commonwealth's payment obligation under § 2303(b) because "those damages are recoverable only from the Commonwealth of Puerto Rico"); Amicus Br. of Com. of P.R. at 5, FMC, 531 F.3d 868, 2007 WL 2344794 ("Pursuant to [§ 2303(b)], allegations of fault or negligence of [PRPA] in its administration of the [Dock and Harbor] Act are answerable by the Commonwealth, not the PRPA.").

**D.**

The last structural indicator concerns the extent to which the Commonwealth government exerts control over PRPA. Unlike the other indicators that we have considered, this one does weigh rather strongly in favor of concluding that PRPA is an arm of the Commonwealth.

As we concluded in Royal Caribbean, and as the D.C. Circuit correctly concluded in FMC, the Commonwealth -- and particularly the governor of Puerto Rico -- exercises a meaningful degree of control and supervision over PRPA. See Royal Caribbean, 973 F.2d at 11-12; FMC, 531 F.3d at 877-78. The governor retains formal control over PRPA through his power to appoint and remove a majority of PRPA's board members. See FMC, 531 F.3d at 877.[21]

---

[21] Four out of five of the members of PRPA's board of directors are heads of Commonwealth agencies. P.R. Laws Ann. tit. 23 § 334. These ex officio members are the Secretary of Transportation, the Secretary of Commerce, the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO"), and the Executive Director of the Tourism Company. Id.; id. § 272 (indicating that the Economic Development Administration was merged into PRIDCO). The governor appoints the Secretary of Transportation, the Secretary of Commerce, and the Executive Director of PRIDCO with the advice and consent of the Puerto Rico Senate and can remove these officers at will. P.R. Laws Ann. tit. 3 § 6 (providing that the governor "shall have the power to remove any officer whom he may appoint," save for an exception not applicable here); P.R. Const. art. IV §§ 5-6 (providing that the governor appoints the Secretary of Commerce and the Secretary of Transportation and Public Works); P.R. Laws Ann. tit. 23 § 280 (providing that the governor appoints the Executive Director of PRIDCO). The Executive Director of the Tourism Company, by contrast, is neither appointed by nor subject to removal by the governor. Instead, the seven-member board of the Tourism Company -- six of whom are private

The Commonwealth also appears to exert a great deal of control over PRPA in practice. See id. at 878. Finally, notwithstanding the "considerable degree of autonomy" afforded to PRPA relative to other Commonwealth-created entities, Royal Caribbean, 973 F.2d at 11, PRPA is subject to a variety of other means of control that point toward an entity being deemed an arm of the Commonwealth.[22]

---

citizens appointed by the governor to four-year terms -- appoints the Executive Director and that board has the power to remove him. See P.R. Laws Ann. tit. 23 §§ 671b-c. The remaining PRPA board member is a private citizen whom the governor appoints with the advice and consent of the Puerto Rico Senate and who is removable only "for negligence in the performance of his/her duties, conviction of a felony or a misdemeanor that implies moral turpitude, repeated and unjustified absences from Board meetings, conflicts of interest or total and permanent disability to perform the functions of the office." Id. § 334. PRPA's chief executive director is appointed by and holds office at the will of PRPA's board. Id. § 335.

[22] PRPA is bound by Puerto Rico's Uniform Administrative Procedures Act ("APA"), P.R. Laws Ann. tit. 23 § 336(l)(3); must submit various reports to the governor of Puerto Rico and the legislature, id. § 345; Pastrana-Torres, 460 F.3d at 127 (noting that mandatory compliance with the APA and mandatory submission of reports to the Puerto Rico governor and legislature indicate Commonwealth control); must maintain its funds in Commonwealth-approved depositories, P.R. Laws Ann. tit. 23 § 338; must submit its accounts and books for periodic examination by the Comptroller of Puerto Rico, id.; Univ. of R.I., 2 F.3d at 1211 (noting that fiscal monitoring may indicate state control); and can have its rights "limit[ed] or restrict[ed]" until certain bonds "are fully met and discharged," P.R. Laws Ann. tit. 23 § 350. Moreover, PRPA contends that the fact that the Commonwealth "has chosen to share its eminent [] domain authority with the PRPA, in a scheme that directly involves the Governor and other members of the Executive Branch," is also suggestive of Commonwealth control. P.R. Laws Ann. tit. 23 §§ 339-339a.

Summing up, the control indicator favors finding PRPA to be an arm of the Commonwealth while the other structural indicators of PRPA's status either point affirmatively against that conclusion (in the case of how Puerto Rico law characterizes PRPA and in the case of the fiscal relationship between PRPA and the Commonwealth) or are neutral (in the case of an overall assessment of PRPA's functions). Because the structural indicators of PRPA's status do not show that the Commonwealth "clearly structured [PRPA] to share its sovereignty," Fresenius, 322 F.3d at 68, we must proceed to the second step of the analysis that Fresenius requires us to undertake, id. at 68, 72.

Here, the picture is quite clear. PRPA has failed to show that this action poses any risk to the Commonwealth's fisc. PRPA does not contend, and we see no basis for concluding, that the Commonwealth would, as a legal matter, be liable for a judgment against PRPA in this case. See P.R. Laws Ann. tit. 23 § 333(b). In addition, the Commonwealth did not structure PRPA so that the Commonwealth would be liable, as a practical matter, for any such adverse judgment.

In this regard, we note that the Commonwealth designed PRPA to raise enough revenue to shoulder its own costs, including its litigation costs, and to bear its own debts, including

(generally) any judgments against it.[23]  Moreover, PRPA has done nothing to meet its burden to show that the Commonwealth's limited exposure in other courts under the Dock and Harbor Act renders any judgment in this action one that, in practical effect, likely would be paid out of the Commonwealth's fisc.  Compare Fresenius, 322 F.3d at 72-75 (finding insufficient case-specific risk to the public fisc even though the Commonwealth had provided approximately 26% of the entity's revenue in recent years), with Irizarry-Mora, 647 F.3d at 16-17 (finding sufficient case-specific risk to the public fisc in part because the Commonwealth contributed at least 60% of the entity's funding).

Thus, the second step of the Fresenius analysis does not show PRPA to be entitled to claim the Commonwealth's immunity. And so, given the mixed signals sent by the structural indicators of PRPA's status at the first step of the Fresenius analysis, we conclude that PRPA has not met its burden to show that it is an arm of the Commonwealth entitled to immunity from this suit.  See Fresenius, 322 F.3d at 68 ("[W]here the evidence is that the state did not structure the entity to put the state treasury at risk of

_____

[23] PRPA does not contend -- by virtue of P.R. Laws Ann. tit. 23 § 2303(b) or otherwise -- that PRPA was "so structured that, as a practical matter, the [Commonwealth] anticipated budget shortfalls that would render [PRPA] constantly dependent on [the Commonwealth]," such that that the Commonwealth would be forced to refill PRPA's coffers in the event of any adverse judgment here. Fresenius, 322 F.3d at 65 n.8.

- 40 -

paying the judgment, then the fact that the state appoints the majority of the governing board of the agency does not itself lead to the conclusion that the entity is an arm of the state.").

**V.**

We close by addressing PRPA's final argument. PRPA relies on language in the Supreme Court's decision in <u>Federal Maritime Commission</u> v. <u>South Carolina Ports Authority</u> ("<u>SCPA</u>"), 535 U.S. 743 (2002).

That case did not involve a dispute over whether the port authority there at issue was an arm of the state. That case involved a dispute over whether the sovereign immunity that the Eleventh Amendment presupposes protects sovereigns from appearing in federal administrative proceedings.

PRPA relies on the following statement that the Court made in resolving that distinct question:

> While state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns.

<u>Id.</u> at 765 (quotation marks and citations omitted). PRPA contends that this same logic supports its position here. PRPA argues that just as a sovereign may assert immunity from federal administrative proceedings even though those proceedings pose no obvious threat to the sovereign's fisc, PRPA should not be barred from asserting

- 41 -

the Commonwealth's immunity in this case simply because this suit poses no risk to the Commonwealth's fisc. But PRPA appears to misapprehend the reason that it may not claim arm-of-the-Commonwealth status.

The fact that this suit poses no fiscal risk to the Commonwealth dooms PRPA's claim to immunity only because -- as our analysis of the structural indicators reveals -- the Commonwealth has sent mixed signals about PRPA's status. By declining to read those mixed signals to express the Commonwealth's intent to make PRPA an "arm," we do not give short shrift to the Commonwealth's dignity. Rather, in exercising such caution, see Fresenius, 322 F.3d at 63 ("[W]here an entity claims to share a state's sovereignty and the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution."), we simply ensure that we do not wrongly confer immunity that ultimately belongs to the Commonwealth on an entity that the Commonwealth did not intend to benefit in that way, see id. ("It would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state [as it would be were a federal court to find erroneously that an entity was not], when the state did not structure the entity to share its sovereignty.").[24]

_____

[24] To the extent that PRPA means to argue that we must make the control indicator dispositive in order to honor the spirit of

## VI.

For the reasons given, the judgment of the District Court is **reversed** and the case is **remanded** for further proceedings consistent with this opinion.

---

SCPA, we disagree.  The Supreme Court considered and rejected that approach in Hess, see 513 U.S. at 48; see also Auer, 519 U.S. at 456 n.1, and because SCPA did not concern a dispute about which entities qualify as arms of the state, it cannot possibly be read to have overruled Hess in this regard.  See Medeiros v. Vincent, 431 F.3d 25, 36 (1st Cir. 2005) ("In the event [the Supreme Court decision at issue] is no longer good law, it should be for the Supreme Court explicitly to overrule it."); Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 242 (2d Cir. 2006) (describing the inquiries in Hess and SCPA as "distinct," as the former involved "what entities are entitled to partake of the State's immunity" and the latter involved "what protections are afforded the state under the Eleventh Amendment").